## CRANE ENAMELWARE COMPANY v. R. I. BOWEN.

Eastern Section.   January 14, 1931.

Petition for Certiorari denied by Supreme Court, April 4, 1931.

C. A. Noone, of Chattanooga, for plaintiff in error.

Joe Frassrand, of Chattanooga, for defendant in error.

THOMPSON, J. The plaintiff below, R. I. Bowen, while in the employ of the defendant below, Crane Enamelware Company, became very ill with lead poisoning. Some months later he brought this suit to recover damages on account of said illness—the suit being based upon the alleged negligence of the defendant in breaching its duties, as master, to him, its servant—not under the Workmen's Compensation Act. He recovered verdict and judgment for $1,000 and costs, and the defendant, its motion for new trial having been overruled, has appealed to this Court and has assigned errors.

The defendant has a large plant at Chattanooga and manufactures enamelwares of various kinds. The plaintiff entered its employ on June 10, 1922, and continued in its employ until about August, 1929.

The process of putting on the enamel is about as follows: The casting upon which the enamel is to be put is heated until it is red hot. The enamel, which is a powder and is not heated, is then sprinkled on the hot casting which melts it. The enamel of course then adheres to the casting. It seems that this process is done twice so that each casting will have two coats of enamel. The enamel is contained in a sieve suspended over the hot casting. This sieve has a handle to it and the enamel is sprinkled on the hot casting by the enameler or his assistant by moving the sieve by means of this handle. In the process it is necessary that the face of the enameler be close to, and somewhat above the hot casting, and in order to protect his face from the heat he has a wooden shield which he holds in position with his teeth or mouth. And, as we understand it, the same is true of the helper. On account of this wooden shield and the necessity of using it, it is impossible for an enameler to wear a respirator to prevent him from breathing any fumes or gasses that might come off the hot casting and melting enamel. But the undisputed proof shows that the enameling room in the defendant's plant is well ventilated by numerous windows in the walls and by openings in the ceiling or roof.

The powdered enamel is made in another room, called the mill room, in which the substances composing the enamel are ground into the powdered enamel. In this mill room there are dust particles of the enamel in the air and the employees therein wear respirators which prevent them from breathing said particles.

The plaintiff entered the employ of the defendant about June 10, 1922, as an enameler's helper, but he seems to have soon become an enameler. He worked in the enameling room—not in the mill room—and of course he did not wear a respirator. Until about the first of January, 1929, the company used only white enamel, but about that time it began using various colors of enamel in addition to the white.

Plaintiff testified that fumes came up from the enamel when it was put on the hot castings and melted, and that he could detect an odor about the fumes from the colored enamel a little different from the fumes from the white enamel, and he seems to think that it was the breathing of the fumes of this colored enamel which produced his lead poisoning. But the only other enameler whom plaintiff introduced as a witness, H. M. Burke, who did the same work for the defendant that plaintiff did, testified that he had never detected any odor from the enamel, and the defendant's witnesses all testified that there were no odors from the enamel.

About the 1st of March, 1929, plaintiff began to suffer an illness but was able to continue working until about March 13, 1929, at which time he became extremely ill and suffered intensely. He remained in this condition for several weeks during which time he was constantly treated by physicians who informed him that his condition was the result of lead poisoning. After some weeks he attempted to and did, at intervals, resume his work for a month or two but finally had to quit entirely. After considering the evidence as to his illness and disability and the medical expenses incurred by him, we do not think that the amount of the verdict, i. e., $1,000 was excessive. But of course the question of the defendant's liability still remains.

During the seven years prior to March, 1929, that plaintiff had worked for the defendant as an enameler or enameler's helper he had never been affected by lead poisoning, and neither could he nor any of his witnesses testify that any other of the defendant's enamelers or their helpers had been so affected prior to about March, 1929. And it is clear from his testimony that the plaintiff believes that it was the colored enamel which occasioned his illness. But it seems that about the 1st of March, 1929, some two or three of the defendant's other enamelers became ill with lead poisoning. And the evidence of all the defendant's witnesses is that prior to about March 1, 1929, none of defendant's enamelers ever became ill as a result of lead poisoning.

The defendant's chemist testified that there was a small quantity of lead in all the enamel; that it varied slightly in the different enamels; that there was nothing calculated to be more deleterious to health in the colored enamels than in the white, and that although

the defendant's employees had been putting on the enamels in the same manner for years none of them had ever been troubled with lead poisoning until the three or four men, including the plaintiff, became ill about March 1, 1929.

After these men had become ill and had claimed that they had been poisoned by the lead in the fumes from the enamel and after one or more of them had instituted suits for damages, the defendant on July 31, 1929, prepared and had its employees, including the plaintiff, read and sign the following printed notice from which we quote a part thereof as follows:

"7. In the manufacture of enamelware a small quantity of lead is used. Over a course of operations covering many years there have been a few cases of lead poisoning developed, all these cases developing at one time. It was not the belief of the officials of the Crane Enamelware Company that there was any danger incident to the employment of anyone connected with the company. However, recently it has been held that it was the duty of the Crane Enamelware Company to notify its employees of any potential or inherent danger, and you are being notified that you may be susceptible to an occupational disease known as 'lead poisoning.' The doctors have told us that there is not any method for us to ascertain who is susceptible and who is not susceptible, therefore when you enter into your duties you must assume the risk incident to your employment."

From the foregoing statement it would seem that prior to about March 1, 1929, when the plaintiff and the two or three other enamelers became ill, the defendant had no reason to believe that either plaintiff or any of its other enamelers or their helpers were in any danger from lead poisoning as a result of their breathing whatever fumes might come up from the enamel, and that there was therefore no duty upon its part to warn plaintiff or its other enamelers and helpers that they might become affected by lead poisoning. And since plaintiff had worked almost seven years without any injurious effect it can hardly be said that he is any more "susceptible" to lead poisoning than the average man.

Since no enameler or helper in the employ of the defendant ever suffered from lead poisoning prior to about the first of March, 1929, and since the colored enamels had never been used until about the first of January, 1929, the natural assumption would seem to be that there was something (probably more lead) in the colored enamels which had not been in the white enamel, and that this something had caused the lead poisoning of the three or four men. But there is no proof that there was more lead in the colored than in the white enamel, or that there was any other deleterious substance in the colored that had not been in the white, or that there was any occasion

for the defendant to fear that any of its enamelers or their helpers might suffer from working with the colored enamels. In fact, the testimony of the defendant's chemist, which is undisputed, is to the effect that there is about the same amount of lead in the colored as in the white enamel, and that there is nothing in the colored enamel that is calculated to be deleterious to the health of the anamelers working with it.

It seems to us that the nearest that plaintiff came to proving any facts from which negligence upon the part of the defendant could be inferred was the following testimony, all of which was objected to by the defendant, of his physician and witness, Dr. C. A. Skelton:

"I don't remember when I first treated a patient suffering from lead poison but it was several years ago I would think. It would be a mere guess but probably my first case in Chattanooga was before the War.

"Q. Where did the person contract lead poisoning? A. I remember that I treated a Mr. Richmond that worked for—

"Q. Do you know where the man worked? A. I remember treating this man Richmond that worked on Chestnut Street for the Crane Enamelware Company and he had lead poisoning.

"Q. Have you seen others? A. I have.

"Q. That worked for the Crane Enamelware Company and that had lead poisoning? A. Yes, sir.

"Q. Have you any idea as to the number? A. Well, probably six or eight—I could not be positive, and may be more than that, I could not state positively as I don't remember.

"Q. I will ask you to state, Doctor, whether or not you have treated any number of men that worked for the Crane Enamelware Company and that had lawsuits against them? A. I have.

"Q. How many years ago was that? A. Well, I don't remember. I don't remember exactly when the first case was brought to me, but it was since the Crane Enamelware Company has been working here.

"Q. State who was the first case that you treated and state if you know in what department he worked? (The witness did not answer this last question.)

"Q. Did you testify in that case as to the condition of that person? A. I did.

"Q. What was his condition? A. Well, he was suffering from lead poisoning or plubism."

After reading all of Dr. Skelton's testimony in connection with the testimony of the other witnesses, we are convinced that the several men he had reference to in his foregoing testimony were the two or three other enamelers who became ill at about the same time that plaintiff became ill. The defendant's attorney did not cross-examine

Dr. Skelton with reference to the above testimony because he insisted that it was not competent and he was afraid that he might by cross-examination make it competent. But in support of his motion for new trial he filed his affidavit in which he stated that since the conclusion of the trial before the jury he had searched the records of the defendant and of the Circuit Court and could find no record of a man by the name of Richmond having ever been ill with lead poison, or of having claimed that he was ill from lead poisoning or of having brought suit on account thereof.

But Dr. Skelton's testimony shows that the man Richmond, to whom he referred as having been ill with lead poisoning years before the trial, had worked at a plant operated by the defendant on Chestnut Street—not at the plant involved in this case. And Dr. Skelton did not say that he had been an enameler. For all that the record shows, the man may have been a painter who had absorbed the lead from paint on his hands, or he may have been an employee in the mill room who neglected to wear a respirator, and the same is true as to the other men mentioned by Dr. Skelton. We think Dr. Skelton's testimony falls short of showing facts from which it might be inferred that defendant had been guilty of any negligence toward plaintiff.

In our opinion there was no material evidence to support the verdict and judgment against the defendant. See the somewhat similar case of Stevens & Son v. Daignault, 4 Fed. (2 Ed.), 53.

The judgment of the trial court will, therefore, be reversed, and the plaintiff's suit will be dismissed at his cost.

Snodgrass and Portrum, JJ., concur.