BROWN v. TENNESSEE CONSOL. COAL CO.—83 S. W. (2d) 568.

MORGAN v. SAME.

Middle Section   March 7, 1935.

Petition for Certiorari denied by Supreme Court, June 10, 1935.

124

L. N. Spears and T. Pope Shepherd, both of Chattanooga (Jeff D. Fults, of Tracy City, W. D. Spears, of Nashville, and Shepherd, Carden, Curry & Levine, of Chattanooga, of counsel), for plaintiff in error, Coal Co.

Thos. M. Lockhart, of Tracy City, and Chas. C. Moore, of Chattanooga, for defendants in error, Brown and Morgan.

FAW, P. J.  Two cases, brought separately against the Tennessee Consolidated Coal Company, but, by consent, tried together to a jury in the circuit court of Grundy county, have been brought to this court in one transcript.  O. M. Brown was the plaintiff in one, and M. A. Morgan in the other, of the two cases.

In the court below, the trial judge overruled motions, made at the close of all the evidence, for a directed verdict in favor of the defendant in each of the two cases and submitted the cases to the jury, and the jury found the issues in each case in favor of the plaintiff, and assessed the damages of O. M. Brown at $2,000 and the damages of M. A. Morgan at $1,000.  A judgment was thereupon entered against the defendant and in favor of each plaintiff for the sum awarded to him by the jury, and for costs.

A motion for a new trial, seasonably filed by the defendant in each case, was overruled, and thereupon the defendant appealed to

this court from each of said judgments, and has assigned errors here.

For convenience, we will designate the parties as plaintiff and defendant, respectively, as they appeared on the record in the trial court.

Each of the plaintiffs sued for $10,000 as damages, and filed a declaration containing a number of counts, which were subsequently extended by amendments of considerable length. The declarations are digested in the brief for plaintiffs as follows:

"The declaration, as amended, charges in substance that the Defendant Company has for several years owned and operated coal mines in Grundy County, having a sand rock top and that, to provide the necessary height for entries and travelways, they have drilled and blasted down two (2) feet or more of the sand rock top throughout the mines. For this purpose, they used air drills, revolving at a high rate of speed and producing a dense fog of very fine sand rock dust which floated in the air, was inhaled by the miners and employees and settled on the sides and bottom of the mine; that the mines have been progressed several thousand feet under ground in this way with fine dust settled over the sides and bottom of the mines throughout this distance; that the coal is hauled from the mines with motors operating at a high rate of speed, creating strong gusts and currents of air by stirring up this settled dust throughout the mine; that the dust created by drilling in the heads and thus stirred up by the motor trips is constantly floating in the air throughout the mine, particularly along the entries and travelways and near the headings, so that the miners and the employees in the mine are compelled to pass through these clouds of rock dust and inhale the same, and the miners and employees working near the headings where the drilling is progressing is (are) compelled to inhale the dust as it is created by the drilling.

"It is charged that the inhalation of the fine particles of rock dust thus created and stirred up causes the same to lodge in the small air passages in the lungs and accumulate therein, so that in time, irritation results and nature throws out a tissue to ward against this irritation termed 'fibrosis,' which fills up the air passages and retards the passage of air and continues to accumulate and increase until finally the lungs will not permit a sufficient quantity of air to pass through and be carried by the blood supply to the cells of the body to properly rebuild broken down tissues, thereby lowering what the doctors call the 'metabolism' of the body. As a result, the heart action is increased and breathing becomes quickened as nature attempts to compensate for the reduced supply of oxygen, the vitality is lowered, strength weakened and a disease sets in called 'silicosis' or 'pneumoconiosis,' which soon disables the victim

and causes death. It is charged that this danger from the inhalation of fine particles of rock dust was a fact that was known or ought to have been known to the Company and was not known to the Plaintiff employees, nor to the public generally; that it was the duty of the Defendant Company to warn the plaintiffs of this danger and instruct them how to avoid the dangerous effects.

"It was further charged that it was the duty of the Company to remove or allay this dangerous condition by the use of proper methods for that purpose which the Company failed and neglected to do. The charge of the amended declaration in each case is in this language:

" 'The defendant breached its duty owing to the plaintiff in respect to the place in which plaintiff was required to work, in that it caused and permitted rock dust to permeate the air, settle throughout the mines, and to be constantly stirred up and carried into plaintiff's working place and the entries and avenues through which he was compelled to pass in going to and from his work, so that such working place and avenues of approach thereto were rendered unsafe and dangerous. The fine rock dust that defendant thus caused and permitted to permeate the air was of an unusual and dangerous character, and the effect of breathing same into the lungs was an insidious and progressive effect. The fine, sharp particles of said rock dust, as the same was breathed into the lungs, had a tendency to stick and accumulate in the lower lobes of the lungs and gradually fill up and irritate the same, could not be thrown out of the lungs by coughing and expectorating, as is the case with ordinary dust, but continued to accumulate until it caused tuberculosis or other disease. Plaintiff, and other victims so exposed, did not and could not by reason of their ignorance and inexperience, know of this insidious danger until it was too late.

" 'On the other hand, the defendant wrongfully and negligently caused and permitted this dangerous condition to exist and failed to adopt proper means and to make and enforce rules, for the prevention thereof, and knew or should have known of the danger of the same, but wrongfully and negligently failed to warn plaintiff of the danger, thereby concealing the fact from plaintiff and keeping him in ignorance of his right of action therefor until less than one year next before the institution of this suit.

" 'Plaintiff's injuries sued for herein was the proximate result of defendant's negligence as aforesaid.' "

The pleas of the defendant are the same in each case and are as follows:

"Comes the defendant and for plea says:

"First: It is not guilty of any wrongs, injuries and trespasses as the plaintiff hath in either count of his declaration alleged.

"Second: That the cause of action, if any the plaintiff had, ac-

crued more than twelve months next before the bringing of the suit in this case.

"Third. Defendant for further plea says, that it did not cause or permit any dangerous condition to exist in the mine wherein plaintiff alleges he was working; nor did it fail to adopt proper means to alleviate any such condition therein; nor did it fail to make and enforce rules for the prevention of any wrongful or negligent or dangerous condition in said mine wherein plaintiff was at work; nor did it wrongfully or negligently fail to warn the plaintiff of any danger therein; nor did it conceal any fact from the plaintiff or keep him in ignorance of any condition within said mine that might be injurious to him; and denies that it fraudulently concealed or undertook to fraudulently conceal any condition within said mine that might be injurious to the plaintiff; nor did it know or have knowledge on its own part that the plaintiff was exposed to any danger other than ordinary dangers within the mines which it assumed from his experience he knew as well as the defendant or its agents could know; nor did the defendant have any notice, knowledge or information of facts that would, arouse any suspicion that plaintiff was susceptible to or suffering from the effects of any injuries or maladies that might arise from the conditions existing in said mines."

The record is a large one. The bill of exceptions contains, among other things, the testimony of thirty-nine witnesses. A digest of the testimony of these witnesses, within a reasonable compass of a written opinion, is impracticable, and is unnecessary. The respective contentions of the parties with respect to the facts of the case and the points of controversy are well stated in the excellent briefs of able counsel.

The view of the facts of the case urged on behalf of the defendant appears from the "Statement of Case" which accompanies the assignment of errors, as follows:

"As indicated by the declaration, these cases present an alleged injury or disease, known by the medical profession as silicosis, which results from the inhalation of small dust particles containing silica, or some hard, gritty substance. The coal mines of the defendant are located at Palmer in Grundy County, and have been operated for many years. Previous to 1920 the drilling in these mines was done by hand drills and up to that time no heavy amount of dust of the sandstone variety was created. Due to the hardness of the sandstone found in these mines and the slowness and effort of hand drilling, the idea of power drilling was conceived and, after experimentation, was adopted. Since that time the principal part of the drilling in these mines has been done by power drill operated by compressed air.

"It was soon discovered that the power drill, working with more

force and speed than the hand drill, created a cloud of dust in and about the headings, or other places where the drills were operated. The drills were operated principally in the headings, but occasionally were taken into the working rooms of the mine and used in drilling rock which had to be removed in order to facilitate the mining operations. This process was known as dry drilling, and was in advance of the discovery of the method of preventing the dust by the use of water in the hole as the drilling progressed.

"For several years there was no suggestion from any source that the dust was dangerous or deleterious. However it was discovered that the operators of the drills, the men who were most exposed to the dense cloud of this dust, were showing signs of disease which was at first thought to be tuberculosis. Several of the men thus engaged broke down in health, were forced to abandon their work, and some of them died. It was then concluded, and after investigation and study was generally conceded, that the inhalation of this dust was injurious to the men and was causing the disease, and to some extent at least responsible for the death of some of the men. This information became general throughout the organization, both executives and employees.

"After the suggestion of such dangers, the defendant through its officers began an investigation and experimentation as to some relief for this situation, and found that by the use of masks over the mouth and nose of the drill operator there was no danger of breathing this dust, and such devices were installed and furnished to each employee engaged in this hazardous work with instructions and warnings to use the masks at all times while drilling or in the dust. It was thought, and as the proof now shows is a fact, that only the men exposed to the dense or heavy quantities of this dust were in danger, and that therefore it was only necessary to furnish masks to the men actually engaged in the drilling. There was no occasion for other miners to be in the heavy atmosphere of dust, except the men operating the drill or some one assisting him.

"The coal miner, or the miner driving the heading, had no duties to perform while the drilling was going on and was supposed to withdraw from the heading or from his working room while the drilling operation was being performed and until the dust was dissipated through ventilation. It was the custom for the miners to leave the place of drilling and retire down the entry to a place of safety and beyond the range of the dusty atmosphere. The dust, while created in large quantities at the particular point of the drilling operation, dissipated itself in the air currents within a very short distance.

"The mine was operated on the basis of a main entry and a return entry for the circulation of air, with cross entries from the main to the return at short intervals. The heading was of course

a head of the last cross entry, but the air currents would take the dust out of the heading into the first cross entry and into the return. This dust settled within a short distance and was not therefore a menace. There was more or less dampness in the mines which of course prevented the dust from rising after it had settled at one time.

"There was some complaint that dust was created by the motor cars as well as mule cars, but this dust was a harmless substance coming principally from ground up particles of coal. There is no reasonable inference that the rock dust was ever again raised after it had settled. After the installation of the masks, there was no further evidence of the disease or injury for several years, but it was found that many of the men refused to wear the masks at all times, or neglected to do so, and that many of them claimed that there was no injurious effects from breathing the dust.

"The defendant however, desiring to make its working conditions as safe as possible, investigated some information received and found that in some places where rock drilling was performed there was in use a process known as wet drilling. It was found that drills were being manufactured with attachments running water through or along the bit into the hole, and that this process not only facilitated drilling but prevented a creation of dust. Thereupon experimentations were made and at considerable expense a type of drill was found suitable for the particular work in defendant's mines and thereafter the wet drilling outfit was installed and has been used almost constantly since about 1929.

"There was a small amount of dry drilling done consisting of drilling small holes in the top of the main entry for the purpose of installing brackets for the electric wires. There was one small job of dry drilling performed in the main entry close to the working room of plaintiff Brown, but this was only a matter of a few shallow holes and did not create dust enough to cause any trouble.

"The best method known before the invention of wet drilling was the use of the mask by the men exposed to the heavy dust condition, and this method was adopted and used by defendant. The most approved method now known for the prevention of dust is the use of the wet drilling process, which defendant has installed and has used in its mines since 1929.

"The ventilation system of the mines was in perfect condition and the law fully complied with in every respect.

"It has not been the custom of other mines in Tennessee, or in the southern area, to use wet drilling, nor even to use masks where dry drilling of this character was done. It has not been considered that there was any danger from this dust, and was not so considered by defendant until its experience with some of its men before the masks were adopted. It has never been the custom of any mine

to take any precautionary measures against the ordinary dust stirred up by the operation of motor or mule cars. It has never been considered that there was any possible danger from such dust, and it is not now so considered by either mine operators, scientists, or medical men.

"Plaintiff Brown claims that he did considerable work in driving the headings and was therefore exposed to the dust while the drilling was in operation. He was not required to work in the heading during this operation and had nothing to do with the drilling operation, although he did at times for his own convenience and own profit work in the heading immediately behind the drillers and therefore in a density of dust. He was not required to work at this place during the drilling and could have, as he often did, retire to a place of safety beyond the first cross entry. He knew that other men had suffered from this dust and had heard the subject generally discussed as to the dangers and bad effects of breathing the dust, but attempts to excuse his conduct by stating that he thought it was only dangerous to the men operating the drill. He also knew that the dust affected him because it filled his nostrils and throat, irritated his throat, made him cough and spit up the dust, and many times gave him a headache. He worked until March, 1931, when he retired and later claimed that he had developed the disease incident to breathing the dust. Suit was filed on the 12th day of February, 1932, about eleven months after he had severed his connection with the defendant.

"Plaintiff Morgan worked in the mines for several years as a driver boss, and spent most of his time in the main entry near the opening, and at a place where the air current was especially heavy and going into the mine. His only presence near the heading, or place where drilling was done, was an occasional visit when some break down or delay in the transportation occurred. He was later moved to the sand house on the outside of the mine and for some time was engaged in drying sand.

"This process consisted of unloading the sand from a car onto hot pipes and then the shoveling of the dried sand through a screen or sieve. This operation occurred in a small frame building which had at least two windows and possibly more, and also an open double door space through which the sand car was run. At times there was considerable dust in this building at the place of work, and of course this dust would be breathed by any one present. This condition was not continuous however, but only occurred while he was shoveling the dry sand through the sieve, and only existed an hour or so a day, all told. This was not however a daily operation.

"The sand house had no unusual features about it to distinguish it from the usual and average method of drying sand in vogue with all mining concerns, many manufacturing concerns and railroad

companies. There is no suggestion that the building was improperly constructed, except the allegation that there was improper ventilation, but the proof undoubtedly shows that the building was practically open to the elements and as thoroughly ventilated as a building could well be. There has never been the slightest idea from any source that this disease could develop from handling river sand, which was used by the Company, or that the conditions under which this sand was dried would cause any injury or disease to a workman. Neither the plaintiff, nor the representatives of defendant, nor the medical men had even heard of any such results.

"This plaintiff knew of the trouble from dust suffered by other men, but claimed in general that he did not know that the dust was dangerous to any one except the drill operator. This plaintiff had an attack of heart trouble in March, 1931, and was not able to return to work. Later he claimed to have been injured by breathing the dust and made application for compensation. An examination indicated serious heart trouble and fibrosis lungs, some of which was tuberculosis and some of which could not be positively identified. As to both plaintiffs, examination of the physicians and the X-rays indicate a tubercular condition, rather than the disease of silicosis, and at most makes a very doubtful case as to whether either of them is or has suffered from an inhalation of the dust, and if any particles of this sand dust have lodged in their lungs, it is of small degree and not the substantial cause of present conditions.

"While it is true that there has been medical knowledge of the disease now known as silicosis, its development as an occupational disease with consequent knowledge has been only of recent date. Outside of the bare existence of the disease, there is not a definite understanding of its causes or effect. In general it is understood that it can be created only under special conditions and circumstances, and that is that it develops slowly from frequent or almost constant exposure to a dense and heavy dust in the atmosphere, and usually can only be found where there is confinement of this heavy atmosphere of dust in an enclosed place of comparatively small proportions. The dust, in order to be dangerous, must be extremely fine and must contain a hard, gritty substance which cannot be absorbed by nature after getting into the lungs.

"The disease called silicosis derives its name from the fact that silica is usually present in the type of dust causing this disease. If the dust is of vegetable origin, like coal dust, it is not injurious as such particles are absorbed or thrown off by the system. The theory is that these small dust particles gradually accumulate in the lung until irritation is set up and then this irritation is fenced off with a fibrous growth which blocks the full breathing capacity of the lungs and leaves a condition similar to a fibrosis following

tuberculosis. This interferes with breathing and the supply of oxygen to the system, and the effect is generally deleterious, and the patient, if permitted to progress, finally breaks down as does a tubercular.

"While the general principles of negligence apply to a case of this sort, there are certain definite principles governing the liability of defendant and the responsibility of the servant to protect himself. The dangerous condition must first be known to the master, or should by the exercise of reasonable care be known to him. At the same time the servant should be ignorant of such dangers and excusably so.

"The master is not responsible, even if conditions were dangerous and resulted in injury to the servant, unless there was sufficient development of scientific knowledge on the subject to charge the master with a superior knowledge. Of course the servant is not chargeable with responsibility as an assumed risk or contributory negligence, unless he had reason to know of such dangers.

"If conditions caused the injury in a form and manner not theretofore known, or reasonably to be anticipated, there could be no liability.

"It was the duty of the master, after discovery of the dangers, to adopt preventive and safety measures for the protection of the employees. It was the duty of the master to warn the servant of unusual, extraordinary or hidden hazards of which he knew, but it was not his duty to warn and instruct the servant as to the ordinary risk of the employment.

"It was the duty of the servant to exercise his intelligence and to use care and caution in discovering the unusual dangers and it was further his duty to avoid dangers which he knew, or had notice of, or had reason to believe existed. The servant assumed the risk of all known dangers and consequent results of exposing himself thereto. The servant was guilty of contributory negligence barring recovery, if his misconduct was a concurring and proximate cause of his injury.

"While the rules of preponderance of evidence and reasonable inference generally applicable prevail, yet there is a peculiar character to this type of cases which requires the establishment of cause of the disease to be shown with a reasonable degree of certainty, or otherwise a verdict would be based on speculation and conjecture.

"On the plea of the statute of limitations applicable to each case, it appeared that the suits were filed on February 12, 1932, and that each of the plaintiffs had quit the service of defendant in March, 1931. It was insisted by the defendant that the cause of action was barred by the statute of limitations for all acts of negligence occurring previous to February 12, 1931; or, in other words, that any

cause of action which the plaintiffs had was for wrongful acts occurring between February 12th and March 20th, 1931. The defendant's position was that these actions involved recurring acts of negligence, and that each time the plaintiffs were exposed to the dangerous conditions and inhaled some of the dust there was completed a wrongful act for which a right of recovery existed for a period of one year, and that plaintiff would be required to limit his action to the concurring acts occurring in the year previous to filing the suit, and that the wrongful act created a cause of action at the time of its commission rather than at the time of the ultimate consequences, or the discovery of them, and further that there had been no concealment of the cause of action from the plaintiff.

"The Court overruled the plea of the statute of limitations and declined to submit the question to the jury and announced that he regarded the injuries as resulting from a condition of continuing negligence, and that this continued up until the time the plaintiffs quit the service and that the cause of action then accrued."

The assignment of errors is the same in each case, and is as follows:

"The Circuit Court erred in overruling defendant's motion for a new trial and entering judgment for the following reasons:

"1. There is no evidence to sustain the verdict of the jury.

"2. There is no evidence that the plaintiff suffered any injury from breathing rock dust, sand dust, or any other mine dust in the mine or at his place of work.

"3. The Court erred in ruling that the statute of limitations had no application to the facts of the case for the reason that plaintiff had suffered injury from a condition of continuing negligence and his cause of action would not be affected by the statute of limitations until he had knowledge, or was informed of the dangerous character of the dust, or until he had severed his relations as an employee.

"4. The Court erred in overruling defendant's motion to direct the jury to return a verdict for the defendant.

"5. The Court erred in refusing to charge the jury as requested by the defendant as follows:

" 'If you find that the injury that these men sustained was contracted prior to February 12, 1931, then I charge you that they are not entitled to recover for any damages sustained prior to that date, but if you think they sustained damages from Februry, 1931, to March, 1931, then you will render a verdict only for damages sustained from February, 1931, to March, 1931.'

"6. The Court erred in overruling defendant's motion to set aside the verdict of the jury, grant a new trial and sustain defendant's motion to direct the jury to return a verdict for the defendant and dismiss the case."

The plaintiffs' version of the "facts," as stated in their brief, is as follows:

"Each of the Plaintiffs had been coal miners all their life, but neither of them had ever worked in a mine with sand rock top where air drills had been operated as in this mine. There was only one other coal mine of that kind in the State, that one in Fentress County. The mining had progressed far under ground and extended by lateral entries for long distances, all of which had been progressed through this sand rock by drilling process. For several years no effort was made to allay the clouds of rock dust produced by the drills. It was permitted to settle on the sides and bottom of the mine. As a result, the entire mine and all of its entries were covered over with a thin film of this rock dust that had settled on the sides and bottom, and the motor trips running at high speed through the mines constantly stirred up this dust, causing clouds of the same to float in the air. It was carried by the air currents into the working places where the Plaintiffs were compelled to work. In getting to and from the work, they were compelled to pass through these clouds of dust. Plaintiff Brown worked near the heading of one of the entries and it was his duty to assist the driller in holding his drill when starting holes. Both while assisting the driller and working near the headings, the air in his working places was more or less charged with floating particles of dust which he was compelled to breathe. He was never warned that there was any danger. He never knew there was danger to any one except the driller himself who held the drill and into whose face and nostrils the stream of fine dust was constantly driven.

"Plaintiff, Morgan, worked in the entry where the motors operated. A large part of the time, he was compelled to breathe the fine rock dust stirred up by the motor trips and by the mule trips from the side entries. Later, he was put to work in a sand house near the mouth of the mine. The Company bought fine sand with which to sand the track to keep the wheels of the motors from slipping. This was first dumped in the sand house where Morgan worked. It was the duty of Morgan then to get all the gravel out of this sand by screening the same, then to dry it out by shoveling it onto hot steam pipes along the side of the sand house. When it was thoroughly dry, it was placed in the sand box of the motors for use. While working in this sand house, the fine particles of sand fogged in the air and he was compelled to breathe the same. He was not warned of any danger from breathing this sand, and did not know that it was dangerous.

"Each of the Plaintiffs worked until less than twelve (12) months before the suits were brought. When they became unable to work, they were examined by physicians and pronounced suffer-

ing from silicosis produced from inhaling rock dust. The Company kept a doctor in its regular employ who, from time to time, treated Plaintiffs before they quit work when they began to suffer from the ill effects. This Company Doctor told Morgan he was suffering from 'valvular heart weakness' and that 'just what produced this heart trouble, I am not in a position just at present to say.' He was careful not to say that he did not know what produced the trouble. Anyhow, he did not tell either of the Plaintiffs that it was the sand that was producing their trouble.

"The proof shows without conflict that the danger of contracting silicosis from breathing rock dust has been well known to medical science for many, many years. Doctor Cheney had been practicing more than twenty (20) years and it had been well known before he began to practice. It has also been shown without conflict that inhalation of coal dust and dust of that character is not dangerous because it is a vegetable product and is dissolved and thrown out of the lungs."

As heretofore stated, the defendant pleaded (in addition to the general issue) the statutory limitation of actions for personal injuries to one year after the cause of action accrued (Code, sec. 8595), and errors are assigned upon the rulings of the trial judge with respect to the defense thus interposed.

In disposing of the defendant's motion for a directed verdict, the trial judge said:

"I am going to hold on this proposition, so far as the Statute of Limitations is concerned, that I would assume for that purpose, that they were injured by the breathing of the dust, we will have to assume that, so far as that fact is concerned. Of course, that will depend on the merits of the case that this was continuous, and if negligence, in my judgment, as long as there was any contribution to this condition by this negligent act of the Company, as alleged, that the cause of action had not accrued, and did not accrue until that terminated and the final injury was set up and there was no further contribution to it by any alleged negligence on the part of the defendant. And I think that occurred up to the time he quit, under their theory of the case. Of course, I say assuming that to be true for this purpose, so, I do not think the Statute has run against them, that is my idea about it, and I so hold."

The only reference to the statute of limitations in the charge of the trial court to the jury was the statement that "there has been filed a plea of the statute of limitations, which has been disposed of by the Court."

At the conclusion of the court's charge, the defendant presented to the court a written request to charge the jury as follows:

"If you find that the injury that these men sustained was con-

tracted prior to February 12th, 1931, then I charge you that they are not entitled to recover for any damage sustained prior to that date, but if you think they sustained damage from February, 1932, to March, 1932, then you will render a verdict only for the damage they sustained from February, 1932, to March, 1932.''

The court refused to charge this request, and such refusal is assigned as error.

All of the questions raised by the assignments of error in this court were presented to the trial court by motion for a new trial, and in disposing of that part of the motion relating to the statute of limitations, the trial judge said:

''By Court: I appreciate the force of the argument on the Statute of Limitations, and it does raise some questions that are open for deliberation. But my idea is, it does not turn on the proposition of fraudulent concealment.

''I could be entirely wrong about it; but my idea is this, on that particular question, that if this condition was there, a negligent condition, and this employee was kept in it, it was in the nature of a continuous condition, and nobody can put their finger on the time or place when it might be said they had this disease called silicosis, if they have it. That is something that comes on gradually, and each time they continued in the dust was a separate tort, and nobody could tell whether that injured them or not. The disease shows to be slow in developing and took a long time to develop. So when it started, no man can tell. Of course, the law does not demand the impossible. My idea on that is, and the tort remained a tort all the way through, and did not terminate itself until the time came that they had developed the disease, and it was continually causing the trouble right on up to that time, being in that respect different from a tort you could place, like an injury by automobile or plane. But if a man was injured and didn't know it, and had a cause of action and let the time pass for suing, then under the law the statute would have run. I cannot see this case that way; it looks different to me. If a tort was committed continuously, right on up until they knew they had the trouble, you would have a tort during this whole time. That may be an odd theory, but that reaches what I think is right on that question; that is the way I believe the law should be and is, so far as this Court is concerned, on the question of the Statute of Limitations.''

The general rule governing the application of the statute of limitations to actions for personal injuries resulting from negligence of the defendant is stated in Wood on Limitations (4 Ed.), vol. 2, sec. 179, as follows:

''In actions for injuries resulting from the negligence or unskillfulness of another, the statute attaches and begins to run from the time when the injury was first inflicted, and not from the time

when the full extent of the damages sustained has been ascertained. The gist of the action is the negligence or breach of duty, and not the consequent injury resulting therefrom. . . . In actions for negligence, the jury are not restricted to damages accrued up to the time of action brought, but may include all which have accrued up to the time when the verdict is rendered, as well as such as are likely to result in the future.''

For more elaborate statements of the general rule, see 37 C. J., pp. 897, 898, sec. 259, and 17 R. C. L., pp. 763-765.

The rule as stated in the above quotation from Wood on Limitations was, in substance and effect, announced and applied in the recent cases of Bodne v. Austin, 156 Tenn., 366, 2 S. W. (2d), 104, and Albert v. Sherman, 167 Tenn., 133, 67 S. W. (2d), 140, 141.

The case of Albert v. Sherman, supra, presented the direct question as to whether the period of limitation applicable to an action for personal injuries commences at the date of the wrongful act or omission or at the date of the damage occasioned. In that case, the effort of the plaintiff was to base the cause of action on the alleged consequential damages flowing from the wrongful act of the defendant rather than upon the original wrong, and, in declining to so hold, the court (speaking through Mr. Chief Justice Green) said:

''Undoubtedly the weight of authority is to the effect that the statute of limitations begins to run against an action of this kind from the date of the wrongful act rather than from the date of the damage caused. Cappucci v. Barone, 266 Mass., 578, 165 N. E., 653; Ogg v. Robb, 181 Iowa [145], 155, 162 N. W., 217, L. R. A., 1918C, 981; Hahn v. Claybrook, 130 Md., 179, 100 A., 83, L. R. A., 1917C, 1169; Wetzel v. Pius, 78 Cal. App., 104, 248 P., 288, and see other cases collected in note 74 A. L. R., 1318. These cases reason that it is the original injury which is the cause of action, or which gives rise to the cause of action, and that the damage sustained is not the cause of action. The statute begins to run when the cause of action accrues. Later injurious developments are merely elements of damage which may be recovered in the original cause of action. Such later developments attach themselves to the primary cause of action, and are not individual causes of action in themselves.

''While there is some conflict in the decisions the majority rule is better sustained by authority and reason. If, as again emphasized in Patten v. Standard Oil Co., 165 Tenn., 438, 55 S. W. (2d), 759, statutes of limitation are to be regarded as statutes of repose, the majority rule should obtain. Recognition of a contrary rule would permit a plaintiff, afflicted with some malady, to trace that malady to an original cause alleged to have occurred years and years ago. No practicing physician or dentist would ever be

safe. The origin of disease is involved in uncertainty at best. While hardships may arise in particular cases by reason of this ruling, a contrary ruling would be inimical to the repose of society and promote litigation of a character too uncertain and too speculative to be encouraged.''

In Field v. Gazette Publishing Co., 187 Ark., 253, 59 S. W. (2d), 19, 20, the Supreme Court of Arkansas applied the same rule as that announced in Albert v. Sherman, supra, to an action for damages resulting from an occupational disease, viz., ''lead poisoning,'' contracted by Field during his employment by the Gazette Publishing Company as a linotype operator.

In the Arkansas case just cited it was contended on behalf of the plaintiff that the statute of limitations was tolled or held in abeyance until the plaintiff, or his physicians, determined the specific malady from which he was suffering, and that this information was not obtained until a date less than three years (the statutory period of limitation in Arkansas) prior to the commencement of the action; but the court (after citing authorities) said:

''As we view the situation the great weight of American authority is to the effect that the cause of action arises and the statute of limitations begins to run from the date of the negligent act and not from the time the full extent of the injury may be ascertained.''

We see no reasonable ground upon which the instant cases may be taken out of the rule stated in Albert v. Sherman, supra, so far as they involve alleged negligent acts or omissions of the defendant prior to February 12, 1931.

It is argued for the plaintiffs that the period of limitation was tolled by fraudulent concealment of the cause of action. We do not think this proposition is supported by pleading or proof. In an amendment to each of the declarations, it is averred that ''the defendant wrongfully and negligently caused and committed (permitted) this dangerous condition to exist and failed to adopt proper means and to make and enforce rules for the prevention thereof, and knew or should have known of the danger of the same, but wrongfully and negligently failed to warn plaintiff of the danger, thereby concealing the fact from plaintiff and keeping him in ignorance of his right of action therefor until less than one year next before the institution of this suit.''

This, as we interpret it, is merely an averment that defendant failed to warn the plaintiff of a danger which defendant knew or should have known, and is not a sufficient averment of a fraudulent concealment by defendant of plaintiff's cause of action. Bodne v. Austin, supra, 156 Tenn., 366, page 370, 2 S. W. (2d), 104; Patten v. Standard Oil Co., 165 Tenn., 438, 55 S. W. (2d), 759; Hudson v. Shoulders, 164 Tenn., 70, 45 S. W. (2d), 1072.

But, whatever the meaning and effect of the quoted averment

may be, we find no material evidence in the record tending to show that the defendant fraudulently concealed the plaintiffs' cause of action from them. The trial judge likewise rejected "the proposition of fraudulent concealment."

■ It is said in the brief for plaintiffs that the burden was on defendant to prove every element of fact necessary to support its plea of the statute of limitations. Such, in our opinion, is not the law in Tennessee. Where issue is joined on the defendant's plea of the statute of limitations, the burden of proof is on the plaintiff to show that the cause of action accrued within the period of limitation. Prigmore v. Railroad Co., 1 Lea, 204; Lawrence v. Bridleman, 3 Yerg:, 496; Shropshire v. Shropshire, 7 Yerg., 165, 167. Although this is said to be the minority rule, it is the prevailing rule in a number of other states, including North Carolina, Alabama, and Arkansas. 37 C. J., p. 1243, sec. 769, and cases there cited.

However, the subject of the burden of proof is immaterial on this appeal.

■ ■ For the reasons we have stated, the defendant's third and fifth assignments of error are sustained.

The remaining questions for disposition are raised by the fourth assignment, that the court erred in overruling defendant's motion to direct the jury to return a verdict for the defendant, and the first assignment that there is no evidence to sustain the verdict of the jury.

These assignments call for an examination of the evidence from the same viewpoint, for, if there was evidence sufficient to require the submission of the case to the jury, there was some evidence to sustain the verdict.

The disease of silicosis, as the basis of an action for damages by an injured employee, has not been the subject of judicial consideration in any reported case in Tennessee, so far as we have been able to ascertain. The case of Crane Enamelware Co. v. Bowen, 15 Tenn. App., 217, was an action for damages suffered by an employee of the enamelware company as a result of an occupational disease known as "lead poisoning." In that case, the Eastern section of this court reversed a judgment for plaintiff and dismissed the case because the evidence showed that prior to plaintiff's illness the defendant had no knowledge that there was any danger to its employees from lead poisoning, and therefore it was under no duty to give any warning to plaintiff; and the Supreme Court denied a petition for certiorari.

The case of Pennsylvania Pulverizing Co. v. Butler (C. C. A. Third Circuit), 61 F. (2d), 311, 312, was an action for damages by Butler against his employer, claiming that while in its service he contracted the disease of silicosis by breathing dust created in the

process of pulverizing sand for commercial purposes. The plaintiff's averments of negligence were: (a) That the defendant failed to use reasonable care to provide the plaintiff with a reasonably safe place to work; (b) that defendant failed to use reasonable care to provide the plaintiff with proper masks or other appliances or safeguards in said work; (c) that defendant failed to use reasonable care to provide a proper ventilating system in its plants; and (d) that the defendant failed to give the plaintiff proper warning, information, and knowledge of the dangerous character of its work with the silica dust. In that case, the court reviewed the evidence and held that the plaintiff had failed to prove by substantial evidence any one of his four averments of negligence, and that the trial court erred in refusing to direct a verdict for the defendant.

The case of Grammer v. Mid-Continent Petroleum Corporation (C. C. A.), 71 F. (2d), 38, 39, was an action by the administratrix of W. J. Grammer to recover damages for his death, which, it was averred, resulted from pneumoconiosis, "a disease characterized by the formation of a deposit in the lungs, the growth of fibrous tissue, and caused by the inhalation of foreign matter." (The record in the instant case shows that silicosis is a form or species of pneumoconiosis.)

In the Grammer Case, supra, the trial court had directed a verdict for the defendant, and, after reviewing the evidence, the Circuit Court of Appeals affirmed the judgment; but there was a vigorous dissenting opinion by one of the three judges of the Circuit Court of Appeals who was of the opinion that "the evidence was sufficient to take the case to the jury on the question of negligence in failing to warn the employee of a latent hazard connected with the employment."

A number of cases involving the duty of the master to warn the servant of the danger of occupational diseases are collated and digested in an annotation found in 4 A. L. R., pp. 488-492.

In the "lead poisoning case," the "silicosis case," and the "pneumoconiosis case," above cited, the courts recognized and undertook to apply settled and familiar principles of law governing the respective duties of master and servant, and their conclusions were merely applications of those principles to the facts of the cases, respectively. In the instant case, as in all jury cases, it was a necessary prerequisite to a review by this court that the verdict be approved by the trial judge. As we understand his statement made in overruling the defendant's motion for a new trial, the learned trial judge found (a) that each of the plaintiffs is "suffering from the disease called silicosis;" (b) that the plaintiffs contracted the disease of silicosis while employed in the defendant's mines; (c) that drilling in rock was "an innovation in mining" and "it was the duty of the defendant company to find out

whether or not this dust would hurt the miners,'' and defendant was negligent in failing to warn the plaintiffs of the latent dangers incident to their employment in the mines; and (d) that the opportunities of the defendant were superior to those of the plaintiffs to ascertain the injurious effects of the rock dust, and, therefore, the plaintiffs did not assume the risk of injury from the rock dust in the mines.

But, in considering the grounds on which the trial judge rested his approval of the verdict, it must be remembered that he was proceeding on the theory that the period of limitation did not begin to run until the consequential damage from the negligent acts or omissions of the defendant had developed, thus predicating liability of the defendant upon every exposure of the plaintiffs to rock dust throughout the period of their employment in defendant's mines.

Under the rule which we have held herein to be applicable, the plaintiffs cannot recover, over the defendant's plea of the statute of limitations, for the consequences of negligent acts or omissions of the defendant occurring more than one year prior to the commencement of their actions.

The undisputed proof shows that the disease of silicosis is very slow in its development. The trial judge so states in his findings. This phase of the proof appears in connected form in the testimony of Dr. Leopold Shumacker as follows:

"Q. With reference to silicosis, you have made a study of that disease? A. Yes, sir.

"Q. Just tell the jury what that is, how it is contracted? A. Well, silicosis, of course is due to a deposit of sand in the lungs. Now, dust, any dust is somewhat irritating, but in order to produce this disease, so far as we doctors know, at least so far as I know, it takes a pretty long exposure. As an illustration, to get silicosis a man has got to be exposed a definite length of time, he has got to have a sufficient concentration of dust, and that dust must be of the right physical properties; in other words, it takes a very fine dust. The way this disease develops is this, the fine dust, which must be at least 1/2500 of an inch, that is, it must be less than ten microns—and micron is 1/1000 of a millimeter, and it takes 25,000 millimeters to make an inch, so this dust to be harmful must be less than 1/2500 of an inch in diameter. for the reason this dust must go through the bronchial tubes out into the branches, out into the very finest of the bronchi, the very smallest divisions of the bronchial tubes, and from them get into the little air vessels. Now, when the fine dust reaches there. it has to be taken up by the cells, by these leucocytes which are in the blood. And one reason the large particles of dust cannot be harmful is because the leucocytes is too small to take it up, even if it reaches to that depth. Of course the larger particles of dust will be deposited in the nose

or mucous membranes of the mouth or the mucous membranes of the larger bronchial tubes. But if it does reach the air vessels and is taken up by these leucocytes, these policemen of the blood, the policemen of the body that fights the invasions of foreign particles, whether germs, dust or what, when these little cells grab the dust particle, when it gets in, in order to get rid of it, they enclose it, take it back to the lymph channels, and silica is poisonous to these cells, they die and there is an accumulation of them and there will be a deposit of fibrous tissue, and of course it takes quite a while. It takes a long time to do so, and from practical experience we know it takes anywhere from three to seven or eight and nine or ten years of moderate dust, fairly constant exposure to produce it. Of course if a person is exposed to unusual dust, of course if you take this room and take dust that had been very, very finely divided in some special process like they do in making scouring soap where the silica is ground up into fine particles, and have a constantly dusty atmosphere, say over a period of months, a year, two years, a person would develop silicosis in a few months according to practical experience. Of course this is not my personal experience, relating to any particular factory, but what I have read from literature.

"Q. What about the density of dust, does that have anything to do with it? A. Yes, it has a great deal to do with it. For instance I do not know how we could compare it to what Mr. Brown had, but it is stated, that it takes at least 20,000,000 particles of this dust in a cubic foot, and these particles should be less than ten microns in diameter, it would take much of concentration of dust to produce silicosis twenty million particles to the cubic foot.

"Q. Now, is it possible, Doctor, for a man to become infected with this disease in a few months, three or four months with an exposure of two or three times a week of a fairly dense supply? A. No, sir, I don't think so."

Dr. Shumacker was a medical witness introduced by the defendant, but his testimony above quoted is not contradicted by other witnesses and is quoted with seeming approval in the brief for plaintiffs.

As herefore stated, defendant adopted the method of "wet drilling" some time in the year of 1929, and thereafter employed that method, with the exception of a few small holes in the top of the main entry for the purpose of installing the brackets for electric wires, and one small job of dry drilling in the main entry close to the working room of plaintiff Brown. The dust created by this last-mentioned dry drilling was necessarily negligible and, moreover, it is not shown that this latter dry drilling was done within one year before plaintiff Brown brought his suit. Wet drilling did not produce dust, and there is no proof of the prevalence of rock

dust in the defendant's mine within the period of limitation applicable here.

In plaintiff Brown's case, we find no material evidence of actionable negligence of the defendant within the period of limitation, and we are of the opinion that the defendant's motion for peremptory instructions in its favor should have been sustained in that case.

Plaintiff Morgan worked for defendant twenty-five years and at the Palmer mine eight years, but throughout the last two years of his employment by defendant he worked in the sand house, and not in the mine. It is evident, therefore, that liability of the defendant to Morgan cannot be predicated on conditions in the mine, but must be found in the proof relative to the conditions of his work in the sand house. The process of drying sand in the sand house and the manner in which it was handled by plaintiff Morgan have been hereinbefore described, and it is seen from that description that the "dust" in the sand house consisted merely of particles of ordinary river sand tossed into the air by means of a shovel wielded by plaintiff Morgan.

There is a striking absence of evidence in the record that such particles of ordinary river sand will, if inhaled, cause silicosis. The expert testimony with respect to the cause of silicosis was directed to the dust caused by dry drilling in the mines, which was, of course, pulverized silica. It will be observed that in the excerpt from the testimony of Dr. Shumacker hereinbefore quoted, it is stated that, in order to cause silicosis, rock dust "must be of the right physical properties," that is, "it takes a very fine dust" to be harmful; that the large particles of dust are not harmful.

In Pennsylvania Pulverizing Co. v. Butler, supra, the dust of which complaint was made was sand "ground to a powder." The proof there showed that "these small dust particles do the mischief; the larger or ordinary dust particles are discharged by the respiratory organs."

The proof shows, without dispute, that defendant's method of drying sand is generally practiced in mines, railroad shops, and other places, and the undisputed testimony of Everette Roberts, defendant's superintendent, who had active charge and control of the mines and sand house in question, is that he had never heard of any one being injured by the dust in the sand house, and that no complaint thereof had ever been made by any one other than plaintiff Morgan, and that he (Morgan) made no complaint until after he quit work for defendant.

If there had been proof that the inhalation of ordinary river sand, not pulverized, may cause silicosis, the failure of defendant to warn plaintiff Morgan of that fact might have been negligence, notwithstanding defendant's lack of knowledge thereof, for "an

obligation rests upon an employer to acquaint his employee with the dangers which can be ascertained by a knowledge of scientific principles governing substances and processes used in the employment, and to which in his ignorance the employee will otherwise be subject." 18 R. C. L., page 571; note, 19 Ann. Cas., 1154; annotation, 4 A. L. R., 488; Wagner v. H. W. Jayne Chemical Co., 147 Pa., 475, 23 A., 772, 30 Am. St. Rep., 745; Zajkowski v. American Steel & Wire Co. (C. C. A.), 258 F., 9, 6 A. L. R., 348, and annotation, page 355.

But in the state of the record as above indicated there is no material evidence upon which a verdict for plaintiff Morgan could be predicated and a verdict for defendant should have been directed.

It results that the first, third, fourth, and fifth assignments of error in each of the two cases are sustained, the judgment are reversed, the verdicts are set aside, and the suits are dismissed.

The two cases having been tried together below and on appeal, the costs, including the costs of appeal, will be adjudged against the plaintiffs, Brown and Morgan.

Crownover and DeWitt, JJ., concur.