TENNESSEE EASTMAN CORPORATION v. NEWMAN.—121 S. W. (2d) 130.

Eastern Section. May 20, 1938.

Petition for Certiorari denied by Supreme Court, October 15, 1938.

Worley, Hauk & Minter, of Kingsport, and Susong & Parvin, of Greeneville, for plaintiff in error.

Harry Garrett, of Kingsport, for defendant in error.

PORTRUM, J.  The defendant-in-error, plaintiff below, George Newman, was an employee of the Tennessee Eastman Corporation from the year 1929 until March of the year 1935, when because of an alleged occupational disease contracted during his employment he became disabled and was compelled to quit his work, and not having recovered he instituted this suit in November 1935, seeking to hold the corporation liable for a violation of the Tennessee Workshop and Factory Inspection Act, carried into the Code under Sections 5339, 5340.  The case was removed by the defendant to the Federal Court and it went to trial, and at the conclusion of the evidence the judge directed a verdict in favor of the defendant upon the common law count, but overruled it as to statutory count; but before the case was submitted to the jury the plaintiff took a voluntary non-suit, and the court ordered that the case be dismissed without prejudice.  The present suit was instituted within one year of the dismissal of the first suit.

To the declaration the defendant filed a plea of not guilty, and a special plea of the statute of limitations of one year.  Code 1932, Section 8595.  Issue was joined upon these pleas and the case went to trial before the court and a jury.  At the outset of the trial the plaintiff agreed that the defendant might file an additional plea of res adjudicata based upon the trial in the Federal Court, and upon a hearing of this plea upon the record of the Federal Court the trial judge was of the opinion that it was an adjudication notwithstanding the voluntary dismissal ordered by the Federal Court without prejudice, and he denied plaintiff the right to rely upon the statutory count of his declaration, nor upon violation of the section of the Code codifying the Workshop and Factory Inspection Act, which had been laid as the basis of liability in a count in the first declaration but did permit the plaintiff to rely upon Section 5340 of the Code, and upon the violation of this section the case went to trial.  The plaintiff took no exception to the revisal order of the trial judge, and the issue before this court is the violation of Section 5340 of the Code.  Plaintiff claims his disability arose from inhaling over a long period of time dust or small particles of sodium carbonate, commonly called soda ash, while unloading this chemical from railroad cars into the receptacles provided by the company at its manufacturing plant.  And that the company had vio-

lated the statutory duty in failing to protect the plaintiff from the injurious effect of this dust, or chemical particles. The statute relied upon reads as follows, and is entitled, ''What to be used to protect employees against dust, filaments, or injurious gases.''

''Every factory, workshop, association, or other establishment where a work or process is carried on by which dust, filaments, or injurious gases are produced or generated, that are liable to be inhaled by persons employed therein, the person by whose authority the said work or process is carried on shall cause to be provided and used, in said workshop, factory, association, or establishment, exhaust fans, conveyors, receptacles, or blowers with pipes and hoods extending therefrom to each machine, contrivance, or apparatus by which dust, filaments, or injurious gases are produced or generated; or provide other mechanical means to be maintained for the purpose of carrying off or receiving and collecting such dust, filament, devitalized air, or other impurities as may be detrimental to the health of those in or about, or in connection with, such place as herein mentioned. . . . Said fans, blowers, pipes and hoods shall be properly fitted and adjusted and of power and dimensions sufficient to effectually prevent the dust, filaments, or injurious gases produced or generated by said machines, contrivances, or apparatus from escaping into the atmosphere or the room or rooms of said factory, workshop, or other establishment, where persons are employed.''

██ With the requirements of the Act in view we will state the method of operation of the plant by the defendant, and the facts as developed in the proof of the case. Defendant's manufacturing plant is located at Kingsport, Tennessee, employing more than 3000 men; it manufactures various articles, such as artificial silk thread, cellulose, alcohol, and other articles, and in the manufacture of these articles it uses many chemicals, among others being sodium carbonate, which is called throughout this record ''soda ash.''

The plaintiff was twenty-three years of age when he went to work for the defendant in 1929; he was then well-built and able-bodied, and was physically fit, having undergone a physical examination by the defendant's physician. He was assigned to the duty of unloading from the railway cars into the receptacle at the side of the car provided by the defendant this chemical known as soda ash, and he continued in the performance of these duties until his disability. Soda ash is a white powdery substance and was shipped to the defendant's plant in ordinary railway cars, being loaded into the cars in bulk or loose form, the doors of the car being boarded up with plank or heavy paper two-thirds of its height, the cars being loaded about two-thirds full.

To unload the cars the defendant ran the cars up the tipple so

that the ash could be placed in the building where it could be used. The car was run up beside a small house, which was constructed at side of track on the tipple at a point so that the car could be placed with its door opposite the house, and connected by placing a plate of metal from the car door into the house. The house was constructed similar to a telephone booth with a missing door, and in the floor was an intake 12 inch pipe with a flared mouth serving as a hopper in which the soda ash was dumped. The ash fell down this pipe by the force of gravity some 20 feet or the height of the tipple, which was constructed and used to obtain the elevation, into a closed receptacle connecting with another pipe-line containing a revolving cup-chain, and these moving cups scooped up the ash and carried it up the incline pipe and deposited it in storage bins known as the still house. This rapidly moving cup-chain stirred up the ash and created a continuous dust cloud which ascended the pipe-line to the small house on the tipple, completely filling it and overpouring into the space between the house and car; entering the car and filling it with dust.

This condition continued during the unloading of the cars, and the employee was required to perform his duties in the dust storm. In unloading the cars the employee standing on the metal plate connecting the car with hopper-house, opened the door and first shoveled the soda ash into the hopper; later, when enough had been taken out, he used a scraper with handles and wheels. The handling of the ash necessarily created some dust, and perhaps this could not be reasonably controlled, except by the use of masks which were used, but the dust arising out of the hopper and permeating the surrounding atmosphere was not controlled by masks since it continually seeped under the masks and entered the mouth, nose and eyes of the workmen. It is not shown why this condition could not have been controlled by the installation of suction, similar to the system used by cotton gins in unloading cotton, or some other method. No attempt was made to install any system to take care of the dust.

The plaintiff-in-error assigns three errors, and then groups the questions raised under propositions of law and facts which are discussed in the brief. We find this a more satisfactory way of disposing of the questions raised than dealing directly with the assignments of error, and we shall follow this course and dispose of the propositions as made. The first is designated (a) and states the proposition that Section 5340 of the Code codifying the Workshop and Factory Inspection Act is not applicable to employees engaged in work in the open air outside of buildings, and that the plaintiff was so engaged and was without the protection of the Act. If this be true, the suit must fail for the declaration is based solely upon this section of the Code. In view of the intent and

purpose of the Act, the court is of the opinion that the place of work here is, and should be classified as, "Other establishments where the work or process is carried on by which dust, filaments, or injurious gases are produced, or germinated, that are liable to be inhaled by persons employed therein." And that it was the duty of the employer to comply with the Act by the installation of exhaust fans, blowers with pipes and hoods, or contrivance or apparatus by which dust, et cetera, may be expelled or controlled. That the place of work was an integral part of the factory, and that dust arose from the operation and within the factory and was expelled upon the employee, who was not working in what should be classified as the open air where natural ventilation would expel the dust particles as contemplated by the legislative enactment. We are cited to no authority construing this or similar enactments, which attempts to classify an open air operation. The primary purpose of the Act was to guard the health of the workmen, and we do not think it permissible for a factory or workshop, or other establishment, to place a workman on the outside of the building at the exhaust end of a dust pipe and require him to perform his duties within the flow of the exhaust, and the employer escape from the duties required by Act on the theory that the workman was placed in the open air rendering the Act inoperative as to him. Certainly this would be a narrow construction of the law and would defeat the primary purpose of its enactment.

██ But it is insisted that the Act is in derogation of the common law and must be strictly construed, and the court has no latitude in carrying out the primary purpose of the enactment, citing Linder v. Metropolitan Life Insurance Company, 148 Tenn. 236, 255 S. W. 43; State v. Cooper, 120 Tenn. 549, 113 S. W. 1048, 15 Ann. Cas. 1116, and especially is this true since the violation of the Act is punishable as a misdemeanor by a fine. De Rossett Hat Co. v. London Lancaster Fire Insurance Co., 134 Tenn. 199, 183 S. W. 720; Kitts v. Kitts, 136 Tenn. 314, 189 S. W. 375. These principles are not applicable upon the question under review, for the Act only designated the means of a common law end; under the common law the employer is required to furnish the employee a safe place to work. Proposition (a) does not present a question justifying the court to take the case from the jury and acquit the defendant of a violation of the Act.

█ The next proposition is stated as follows: "(b) Plaintiff's ailments and disabilities are not the result of any industrial disease contracted in the course of his employment, but are the results of diseased and infected tonsils, pyorrhea of the gums and other ailments arising from natural causes for which defendant is not liable."

This presents a question of fact which was at issue in the lower

court upon conflicting evidence. It is true that the defendant introduced a large number of professional witnesses who testified that the plaintiff's ailment was due to infected tonsils, pyorrhea, and known diseases which were not caused by inhaling the chemical dust matter. But the plaintiff introduced professional testimony which established that the plaintiff was suffering from chronic bronchitis and other ailments of the respiratory organs, which was according to medical science and the opinion of the witness the direct result of inhaling over a long period of time dust particles, and that the inhaling of the foreign matter as a resultant cause contributed and was the primary cause of the accompanying ailments, of tonsilitis, pyorrhea, et cetera. The cause and effect of occupational diseases of this character are fully and ably discussed and described, by Presiding Judge Faw, in the case of Brown v. Tennessee Consolidated Coal Co., 19 Tenn. App. 123, 83 S. W. (2d) 568, which discussion is ably supplemented in the case of Marsh v. Industrial Accident Commission, 217 Cal. 338, 18 P. (2d) 933, 86 A. L. R. 563. These dissertations upon disease, its cause and effect, fortify the opinion of the plaintiff's professional testimony, and justify its acceptance as a scientific truth, and on the other hand these scientific facts as adopted and approved by the courts in the reported cases discredit the testimony of the defendant's professional witnesses. The plaintiff breathed this dust for a period of six years, during which time he had unloaded 477 and ½ carloads; he was a healthy specimen when he began work and was disabled when he quit; the work was recognized as hazardous by his employer, for he was allowed a larger number of hours on his pay roll for unloading cars than was necessary for the time taken in unloading the cars. He was arbitrarily credited with a certain number of hours on each car when it was known that he unloaded the car in a lesser time by several hours. There is no warrant from the evidence in concluding that the plaintiff was not afflicted with an industrial disease attributable to the dust inhaled over the period of his employment; the trial court would have committed error in taking the question from the jury.

██ Under propositions (c) and (d) the statute of limitation is raised in two instances. Under (c) an attack is made upon the sufficiency of the pleadings under a motion for a directed verdict; if the pleadings were demurrable, a demurrer should have been filed and it is not permissible to use a motion for a directed verdict as a demurrer; its purpose is to determine if there be any evidence to establish a cause of action. And the proof establishes, without contradiction, that a new suit was instituted within a year after the dismissal of this suit in the Federal Court. The trial judge was reviewing the evidence upon the motion and it cannot be put in

error for a failure to treat the motion as a demurrer and act upon it as such.

Proposition (d) raises a more difficult issue. It is insisted that since the suit was instituted November 29, 1935, and that the plaintiff quit work on March 2, 1935, that he can recover only for injuries sustained from the period beginning November 29, 1934 (one year before the institution of the suit), and ending with March 2, 1935, the date of his quitting work. And that during this time he unloaded but nine cars of soda ash, and he has failed to establish that the unloading of these nine cars contributed to his injury or disease, or if so, to what extent, and under such circumstances he is not entitled to recover for the reason that he has not made out his case, and·it is not permissible for a jury or the court to speculate upon. such a matter. In support of this proposition the case of Brown v. Tennessee Consolidated Coal Co., 19 Tenn. App. 123, 83 S. W. (2d)· 568, is cited. This question was raised in that case and the trial judge's opinion in overruling the defendant's insistence is set out, and the judgment of the trial court was finally reversed, and from a casual glance at the opinion one would be led to believe that the position of the defendant was sustained, but such is not the case. The question determined was that the suit was not instituted within one year after the injury, or the last injury was sustained, and the fact that the existing occupational disease was not discovered by the plaintiff until the running of the statute of limitations did not toll the statute, for the statute began to run from the date of the injury and not from the date of the discovery of the consequences of the injury. Citing Bodne v. Austin, 156 Tenn. 366, 2 S. W. (2d) 104, and Albert v. Sherman, 167 Tenn. 133, 67 S. W. (2d) 140. The facts in the Brown Case were that the plaintiff was working in a coal mine in dry dust for the defendant over a period of time when he contracted an occupational disease known as silicosis, which was caused by the continuous breathing of dust. But for two years before the ins⁴ tion of the suit the defendant company had installed an apparatus for dampening the atmosphere and controlling the dust, and for that period of time the plaintiff had breathed no coal dust and the defendant during the period had committed no tort contributing to the then condition of the plaintiff. Under this state of facts the one year period of limitation had expired since the commission of the last tort by the defendant. The Brown Case is not authority for and does not settle the issue presented here.

The proof in the case before us establishes that the affliction known as chronic bronchitis and its accompanying injury to the respiratory organs was caused by the continuous breathing of fine dust composed either of chemical matter or mineral substance; by the breathing of the substance over a long or short period of time,

due to the resistant power of the patient. That the disease develops and progresses for a period of eight or more years before disabling the patient in some cases, while in other cases it comes on suddenly, developing and destroying the patient within three to four months. That the disease destroys the tissue of the organs from which death ultimately results. The plaintiff testifies that he was not conscious of any ill results from the disease but for two or three months at the end of his employment, and up to this period of time he did not know he was afflicted with the disease. He then describes his symptoms during the last few months of his employment and up until the time of his total disability, and the evidence raises the question, Did he contract the disease within the last three or four months? or was it of long standing covering a period of three to six years?

If the inception of the disease is of long standing and cumulative in effect then it is insisted his recovery must be measured by the injury sustained during that period measured by the statute of limitation of one year prior to institution of suit. In other words, a recovery only for the effect of the torts committed during the last four months of employment, which time fell within the statutory period. Conceding that defendant is guilty of a continuing tort, the effort is to induce the court to apply the rule of the measure of damages as is applied in the cases of recurring damages to real estate, which likewise grows out of continuous tortious acts. Cincinnati N. O. & T. P. R. Co. v. Rody, 132 Tenn. 568, 179 S. W. 143, L. R. A. 1916E, 974; Carnegie Realty Co. v. Carolina, C. & O. R. Co., 136 Tenn. 300, 189 S. W. 371.

The answer given to this is that the proof establishes the fact that the disease could have been and may have been contracted within the aforementioned four months period, and within the statute. It is true the proof shows the disease may be of long duration (eight years) or of short duration (three months) but the expert witnesses were unable to determine from any physical or scientific facts how long the disease had persisted in this case, if in any case in the absence of an examination during the period. The answer is not a satisfactory one, for it leaves the court and jury to guess as to the disease's duration.

The statute was enacted to prevent as far as reasonably possible the contraction of these occupational diseases; and they are of long duration from inception to discoverable disability, while the statute of limitation prescribes a short period. To restrict the recovery to the limitation period will in a large measure defeat the purpose of the humanitarian act for the result will exempt the employers from civil damages for the wrongs inflicted in violation of law. When two acts conflict in a manner to destroy one or the other, they should be construed in a way to harmonize the purposes of

each if permissible, and give full effect to the intention of the lawmaking body.

The courts in the cases discussing the statute of limitation and when it begins to run, use these expressions: "A single tort can be the foundation for but one claim for damages. . . ." Cincinnati, N. O. & T. P. R. Co. v. Roddy, 132 Tenn. 568, 574, 179 S. W. 143, 144, L. R. A. 1916E, 974; "and it may be stated as an invariable rule that when the injury, however slight, is complete at the time of the act, the statutory period then commences." Bodne v. Austin, 156 Tenn. 366, 371, 2 S. W. (2d) 104, 105; State v. McClellan, 113 Tenn. 616, 627, 85 S. W. 267, 3 Ann. Cas. 992. These expressions convey the idea the courts were dealing with one completed tort from which nominal damages immediately arose and consequential damages began to flow.

In this case we have a continuous act or omission in violation of law, from which a continuous additional inquiry is inflicted with a cumulative result. In fact, it is one continuous tort, beginning with the employment and ending only at the time of total disability of the employee and the termination of his employment.

The rule applied in measuring damages in cases of recurring damages to real estate is in fact governed by a separate statute of limitation of three years made applicable expressly to this class of cases, Code 1932, Section 8598, and it affords no reason for the adoption of a similar measure of damages under another statute of limitation.

The court is of the opinion since the suit was instituted within one year of the disability and termination of employment ending the continuous tortious omission of duty by defendant, and the cumulative ill-effects thereof, that the statute of limitation is not applicable, and plaintiff is entitled to recover full damages for the injury sustained. The court applies the measure of damages adopted in cases of continuous tort growing out of the continuous breach of contract of marriage and accompanying seduction.

"The proof of the plaintiff below tended to show a contract of marriage entered into the day after the first illicit act, and improper relations existing between her and the defendant below from this time up until within 12 months of suit. During all the time this unlawful relation continued, the parties were under a contract of marriage.

"Such being the case, under the rule laid down in Davis v. Young, 90 Tenn. 303, 16 S. W. 473, to the statute of limitations would not begin to run against such a plaintiff until the last illegal act had under the promise of marriage. . . .

"Davis v. Young, supra, has been expressly approved in Ferguson v. Moore, 98 Tenn. 342, 39 S. W. 341, where the trial judge charged that 'seduction was a continuous act, and, if by several and

continuous acts, promises, and artifices the defendant kept up his illicit intercourse' until within the statutory limit of suit, the action would not be barred. This was commended as in accord with Davis v. Young, supra, and that authority extended to suits brought by the female as well as by her father.'' Heggie v. Hays, 141 Tenn. 219, 225, 208 S. W. 605, 606, 3 A. L. R. 150.

For other cases dealing with the transaction as a continuing one being within the period of the statute of limitation, see Gillette v. Tucker, 67 Ohio St. 106, 133, 65 N. E. 865, 93 Am. St. Rep. 639; Akridge v. Noble, 114 Ga. 949, 41 S. E. 78; Weatherhead v. Boyers, 7 Yerg. 545.

Proposition (f) is that the plaintiff being acquainted with the conditions of the work assumed the risk and he is guilty of contributory negligence and cannot maintain the action. A citizen cannot by contract or by acquiescence in the unlawful condition nullify the police power of the state when defined by an enactment. When the statute is violated by the master the servant does not assume the risk regardless of his knowledge. American Zinc Co. v. Graham, 132 Tenn. 586, 179 S. W. 138; Knoxville News Co. v. Spitzer, 152 Tenn. 614, 279 S. W. 1043.

This disposes of the propositions presented in a manner requiring the overrulement of the assignments of error and the affirmance of the judgment below, with costs, which is so ordered.

Ailor and McAmis, JJ., concur.