**H. T. MAHONEY**

v.

**UNITED STATES of America.**

Civ. A. No. 4214.

United States District Court

E. D. Tennessee, N. D.

Dec. 7, 1962.

**524**

H. Calvin Walter, Knoxville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

Plaintiff sues the United States of America for damages under the Federal Tort Claims Act for injuries or disease resulting from his exposure, as a maintenance mechanic of Union Nuclear Carbide Company (hereinafter called Carbide) in the K–25 Area at Oak Ridge, Tennessee, to radioactive and toxic substances and materials. Plaintiff went to work for that Company in 1951 and was placed on leave and hospitalized in March, 1961 for chronic lymphocytic leukemia.

The defendant has filed a motion for summary judgment and in the alternative for dismissal. The grounds are (1) that the Tennessee Workmen's Compensation Law provides the sole remedy for injury or disease since the plaintiff at the time was an employee of Carbide, a division of Union Carbide Corporation, which was operating the Government-owned K–25 facilities at Oak Ridge pursuant to contract with the Atomic Energy Commission (hereinafter called the Commission), (2) that the United States is not a "third party" tortfeasor within the meaning of the Tennessee Workmen's Compensation Act, and (3) that the action cannot be maintained under the Federal Tort Claims Act since a private person would not be liable under like circumstances under Tennessee law.

At the original pre-trial and in the first argument on the Government's motion, it developed that both plaintiff and his employer, Carbide, had elected to come under and were subject to the provisions of the Workmen's Compensation Act of Tennessee. This fact was not contested by plaintiff. It is the Government's contention that plaintiff's sole remedy is against Carbide under the Workmen's Compensation Law. Title 50 T.C.A. 908 reads, in part, as follows:

> "*Right to compensation exclusive.*
> —The rights and remedies herein granted to an employee subject to the Workmen's Compensation Law on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, * * * at common law or otherwise, on account of such injury or death."

Also at the original pre-trial and argument on the motion, the Court pointed out that if Carbide were the agent of the defendant, under the Tennessee cases, plaintiff's chances of recovery were greatly weakened and plaintiff conceded this. But because of the complexity of the relationship between the defendant (acting by and through the Commission) and Carbide, the Court overruled the motion of defendant in order to provide plaintiff full opportunity to present evidence on said relationship. However, in overruling the motion, the Court made it clear that its action was without prejudice to defendant to renew its motion at the hearing on the merits.

After the original pre-trial, and after the argument and ruling on the motion, the plaintiff amended his complaint to allege that Union Carbide Corporation, the signatory to the contract with the Commission (and not the Union Carbide Nuclear Company, which was alleged to be the employer in the original complaint) was an independent contractor and employer of plaintiff in place of the allegations in the original complaint that Union Carbide Nuclear Company was the operator of defendant's facilities in the K–25 Area and subject to defendant's control. In its amended answer, defendant denies that Union Carbide Corporation or its operating subsidiary, Union Carbide

Nuclear Company, by whom it alleged plaintiff was employed, was or is an independent contractor.

Subsequently, on March 21, 1962, the Court amended its Order Pursuant to Pre-Trial to direct that at the hearing the Court would first try all legal issues between the parties and bearing upon the right of plaintiff to maintain the action and excluding issues and questions of causal relation and damages. Included for hearing were application of the Tennessee Workmen's Compensation Law, whether the action is maintainable under the Federal Tort Claims Act and other issues involving the jurisdiction of the Court.

At this hearing on November 1 and 2, 1962, the additional defense of the statute of limitations was raised and argued.

■ The Court has heard proof on the question, whether Carbide, in the operation of K–25, acted in the capacity of an independent contractor or as agent for the Government.

A brief summary of the proof and stipulations shows that Union Carbide Corporation is qualified to do business in Tennessee and that the Union Carbide Nuclear Company is merely a division of Union Carbide and not a separate agent. Carbide negotiates labor contracts, but the Government has the right to approve or disapprove. Carbide operates the health program. Carbide cannot subcontract work without the approval of the Government. Plaintiff is a member of Local Union No. 9288 and was employed in the K–25 plant as a mechanic. He had many supervisors, but all of them were Carbide employees. He states that his only connection with the Commission was in obtaining his Q Clearance; that Commission personnel made inspections on an average of each three months. He was laid off from work on March 10, 1961 and terminated June 28, 1961 due to reduction of force. His suit was filed April 6, 1961.

Aetna Insurance Company carries workmen's compensation insurance on all of the employees of Carbide at K–25 plant. It is called a retrospective policy. In 1947, occupational diseases were brought within the workmen's compensation coverage. The Government bears all expenses for investigation of sickness of employees of Carbide. Carbide pays Aetna from funds advanced by the Government. Eighty-three hundred workmen's compensation claims have been filed in an eighteen-year period and the Government has paid out in excess of $3,300,000.00 workmen's compensation benefits over that period.

In May, 1958, several suits that were filed under the Federal Tort Claims Act against the Government were settled.

The workmen's compensation policy was issued to Carbide.

The Commission has about 770 employees at Oak Ridge, while Carbide employs about 22,000. There are about 2,750 employees at the K–25 plant, which utilizes the gaseous diffusion process for enriching uranium. This plant receives its feed material from other plants. The material is owned by the Government as well as all the plant and plant properties. Carbide operates K–25 and the Government works closely with it or on a day-to-day basis. Carbide was the original operator of gaseous diffusion plants for the Government.

The Government supervises the operation of management contracts. The Commission staff helped integrate the Oak Ridge program with the entire program of the Commission. The schedules are established by the Commission. It procures the electric power and keeps inventories of the materials and prepares the form of order for purchases of isotopes from Carbide. Carbide estimates the cost of operation which the Commission approves or disapproves and the estimates are submitted to Congress for appropriations. The Commission supervises engineering and construction of facilities of each Government-owned plant. It controls litigation. It controls the shutdown of the plants, and has almost daily meetings with officers of Carbide.

The Commission has licensing and regulatory control over Carbide. It deals with exposures of employees and approves all contracts with contractors. It prepares forms for invitations to bidders. It advances operating costs to Carbide, the funds for which are deposited in the bank in the name of Carbide but never lose their identity as Government funds. The accounting records of the Government are kept separate from Carbide's corporate records.

The six categories of jobs in the Carbide set-up are approved by the Commission. Carbide's method of accounting is controlled by the Commission. Carbide furnishes the "know-how" to operate the plant. The technical direction of the plant is with the employees of Carbide. Carbide fixes salaries and wages of all employees except that a salary of over $20,000.00 per year must be approved by the Commission. Carbide has health and safety programs which meet certain criteria fixed by the Commission. Carbide is given the right to hire and fire employees at the plant.

Relevant provisions of the Federal Tort Claims Act are found in Sections 1346(b) and 2674 of Title 28 U.S.C. We quote each, in part, as follows:

Sec. 1346,

"(b) Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for * * * personal injury * * * caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.*" (Emphasis added.)

and, Sec. 2674,

"The United States shall be liable, respecting the provisions of this title relating to tort claims, *in the same manner and to the same extent as a private individual under like circumstances * * *.*" (Emphasis added.)

There are two further Tennessee statutes which have a bearing on the problem. We quote in part from 50 T.C.A. 914, and quote all of Section 915:

"50-914. *Liability of third persons—Subrogation of employer—Limitation of actions.*—When the injury or death for which compensation is payable under the Workmen's Compensation Law was caused under circumstances creating a legal liability against some person other than the employer to pay damages, the injured workman * * * shall have the right to take compensation under such law and said injured workman * * * may pursue his * * * remedy by proper action in a court of competent jurisdiction against such other person. In the event of recovery from such other person by the injured workman * * * by judgment, settlement or otherwise, the employer shall be subrogated to the extent of the amount paid or payable under such law, and shall have a lien therefor against such recovery and the employer may intervene in any action to protect and enforce such lien. * * *"

"50-915. *Liability of principal, intermediate contractor or subcontractor for injuries to any employee—Remedies—Recovery.*—A principal, or intermediate contractor, or subcontractor shall be liable for compensation to any employee injured while in the employ of any of his subcontractors and engaged upon the subject-matter of the contract to the same extent as the immediate employer.

"Any principal, or intermediate contractor, or subcontractor who shall pay compensation under the foregoing provisions may recover the amount paid, from any person who, independently of this section, would have been liable to pay compensation to the injured employee, or from any intermediate contractor.

"Every claim for compensation under this section shall be in the first instance presented to and instituted against the immediate employer, but such proceedings shall not constitute a waiver of the employee's rights to recover compensation under this law from the principal or intermediate contractor, provided that the collection of full compensation from one (1) employer shall bar recovery by the employee against any others, nor shall he collect from all a total compensation in excess of the amount for which any of said contractors is liable.

"This section shall apply only in cases where the injury occurred on, in, or about the premises on which the principal contractor has undertaken to execute work or which are otherwise under his control or management. [Acts 1919, ch. 123, § 15; Shan. Supp., § 3608a164; Code 1932, § 6866.]"

■ Section 1346(b) of Title 28 U.S.C. limits the liability of the United States to that of a private person to the claimant in accordance with the laws of the place where the act or omission occurred. Massachusetts Bonding & Insurance Co. v. United States, 352 U.S. 128, 129, 77 S.Ct. 186, 1 L.Ed.2d 189; Hopson v. United States, D.C., 136 F.Supp. 804, 812. The injuries for which plaintiff seeks damages are alleged to have occurred in the course of his employment in the K–25 Area at Oak Ridge, Tennessee. As we construe Sec. 1346(b), determination of the liability of the United States depends upon the application of the Tennessee law to the facts of this case.

The tests which distinguish the independent employer from the master and servant relationship have long been stated in the Tennessee cases. In Powell v. Virginia Construction Co., 88 Tenn. 692, 697, 13 S.W. 691, 692 the Court said:

"An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, and without being subject to control of his employer, except as to the result of his work. The employer of such a contractor, if he be a fit and proper person, and the work be not in itself unlawful or a nuisance in itself, or necessarily attended with danger to others, will not be responsible for his negligence, or that of his subcontractors or his servants. * * * 'in every case, the decisive question is, had the defendant the right to control, in the given particular, the conduct of the person doing the wrong?' 2 Thomp.Neg. 909." (Emphasis added.)

In Odom v. Sanford & Treadway, 156 Tenn. 202, 207, 299 S.W. 1045, 1046, the Court said:

" * * * if the employee is under the control of the employer, he is a servant or employee and not an independent contractor, but, if in the performance of the work he is not under the control of the employer, he is an independent contractor * * * it is not the * * * exercise of the right by interfering with the work but the right to control which constitutes the test. The test * * * is * * * whether the employee represents the employer * * * as to the result of the work or only as to the means; if only as to the result, and in the employment of the means he acts entirely independent of the master, he must be regarded as an independent contractor." (Emphasis added.)

The same Court said the question is ordinarily one of fact, and that whether

the employer exercises control may be a fact to be considered in determining the ultimate fact, namely, the relationship of the parties. The fact that the work is subject to the direction, inspection and acceptance of an engineer does not render it a master and servant relationship. The reservation of the right to prescribe what shall be done, but not how it shall be done does not divest the employee of the character of a contractor.

In Chunn v. Memphis Flooring Company, 7 Higgins, 532, 540, the Court in referring to the Powell case, supra, said, " * * * not only the contract but all the surroundings, the objects and the subsequent conduct of the parties may turn out to be material in determining what was the real connection of the parties." It observed there was no point in multiplying definitions—that the simplest and best one was found in the Powell case to the effect that an independent contractor is one who "undertakes an enterprise for another according to his own will and dictation, being responsible to his employer for the completed job." It went on to say that the manner of paying the underservant, of compensating the contractor, the furnishing of materials by the employer and the retention even of limited control were all material factors justifying inference contractor was not independent of employer.

In Howell v. Shepherd, 29 Tenn.App. 375, 382, 196 S.W.2d 849, the Court said if the employer reserves the right to control or direct the time, place and methods and means by which the work was done, the relationship was one of principal and agent, or of master and servant, but if it was concerned only with results and employee is allowed to perform the work in any manner he pleases as to time, place, means and methods and is accountable only for results, he is an independent contractor.

In D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 514, 206 S.W.2d 897, 904, the Court said:

" 'The definition given by the Restatement of the Law of Agency, sec. 2, (3), is this: "An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking."

" 'This right of control is the distinguishing mark which differentiates the relation of master and servant from that of employer and independent contractor. Other factors are looked to only to aid in determining whether such right existed in a given case. See Restatement of the Law of Agency, sec. 220, for an enumeration of such factors. Wherever the defendant has had such right of control, irrespective of whether he exercised it or not, he has been held to be the responsible principal or master. * * * ' "

In Jarratt v. Clinton, 34 Tenn.App. 670, 677, 241 S.W.2d 941, 944, the Court said:

"All our cases show that the decisive test, and the touchstone of the distinction, of the relation of master and servant from that of employer and independent contractor is: 'Had the defendant the right to control in the given particular the conduct of the person doing the wrong?' If so the relationship between them is that of master and servant and not that of employer and independent contractor. D. M. Rose & Co. v. Snyder, 185 Tenn. 499, 513–514, 206 S.W.2d 897, and the numerous cases there cited."

In the Restatement of the Law, Agency, sec. 220(2), suggested factors bearing on the relationship are listed:

"§ 220. *Definition of Servant.*

\* \* \* \* \* \*

"(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

"(a) the extent of control which, by the agreement, the master

may exercise over the details of the work;

"(b) whether or not the one employed is engaged in a distinct occupation or business;

"(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a special-ist without supervision;

"(d) the skill required in the particular occupation;

"(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

"(f) the length of time for which the person is employed;

"(g) the method of payment, whether by the time or by the job;

"(h) whether or not the work is a part of the regular business of the employer;

"(i) whether or not the parties believe they are creating the relation of master and servant; and

"(j) whether the principal is or is not in business."

In McVeigh et al. v. Brewer, 182 Tenn. 683, 189 S.W.2d 812, there was a collision between a truck owned by Keith Williams Company and one owned by Stone & Webster Engineering Corporation. The driver of Keith Williams truck sued Stone & Webster and its driver for personal injuries. The accident occurred at Volunteer Ordnance Works owned by the United States. Its management contractor was Hercules Powder Company, which in turn contracted with Stone & Webster for certain construction work, including certain roads, with complete control of the project remaining in Hercules. Stone & Webster contracted with Smith Stone Corporation to furnish crushed stone to the job site and Smith contracted with Keith Williams Company, a trucking company, for delivery of the stone.

Tennessee Code Sections 6865 and 6866 which were in effect at the time, are substantially the same as Sections 914 and 915 of Title 50, Tennessee Code. Construing the contracts between the United States and Hercules and between Hercules and Stone & Webster, the Court concluded that Keith Williams was a "principal, or intermediate, or subcontractor" within the meaning of Sec. 6866 of the Tennessee Code and it and its driver were engaged "upon the subject-matter of the general contract" and that the "injury occurs on, in, or about the premises on which the principal contractor has undertaken to do work, or which are otherwise under his control or management." The Court, after analyzing a number of Tennessee cases, concluded that Sec. 6859 of the Code (substantially the same as 50 T.C. 908) was controlling and that the remedy afforded plaintiff against his employer and other subcontractors excludes all other rights and remedies and that Stone & Webster and McVeigh were not liable as third persons to the plaintiff for injuries suffered in this common enterprise.

Although there were five tiers of employment in the McVeigh case, it has, as we shall see, important similarities to the case before us in the matter of the relationship of the various contractors.

In Bowaters Southern Paper Corporation v. Brown, 253 F.2d 631 (C.A. 6), a case which came up from Tennessee and which involved the application of the Tennessee Workmen's Compensation Act, the Court, in affirming the District Court, noted that the appellee was the employee of Huffman-Wolfe, the contractor of appellant. He was paid by Huffman-Wolfe and worked under its direction. It observed that Huffman-Wolfe was engaged in the mechanical contracting business, had its own tools and equipment and performed the work in its own manner, with its own labor and directed by its own supervisors. It hired and discharged its

own men, and was paid for the entire job and not on a time basis. The Court of Appeals concluded that all these circumstances satisfied the test that Huffman-Wolfe was an independent contractor. It, therefore, affirmed the action of the District Court in permitting the common law action against the paper mill as a third party tortfeasor and not limiting the injured party to his remedies under the Workmen's Compensation Act.

The case is all the more interesting in that the work was done on a cost-plus basis and that the wages of Huffman-Wolfe's superintendents, foremen and mechanics and laborers were considered reimbursable costs in arriving at the contract price. The contract costs included Huffman-Wolfe's payments to the Federal Insurance Contribution Act, Federal Unemployment Tax Act and State Unemployment Compensation. The agreement between Bowaters and Huffman-Wolfe also provided that the latter was to furnish comprehensive liability insurance, workmen's compensation insurance and employers' liability insurance as required by the laws of Tennessee.

The McVeigh case is distinguishable on the ground that plaintiff's immediate employer was engaged, at the time and place of the injury, upon the subject matter of the general contractor on the premises on which the principal contractor had undertaken to do work. This work was under the control or management of the principal and plaintiff was limited to his remedies under the Workmen's Compensation Act. The Court noted also that the Government retained complete control of the contract and could terminate it at any time.

Before examining in more detail the contract and other evidence before it, an examination of the case of Powell v. United States Cartridge Co., 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017, will be helpful. This case involved the Fair Labor Standards Act rather than a state Workmen's Compensation Act. But, as we shall see, it involved an operation and contract similar in many respects to the

ones before us, and the Court with this different question before it held the employees of a cost-plus-a-fixed-fee private contractor operating a Government-owned munitions plant were employees of the contractor within the meaning of that Act. In reaching its decision, the Court said:

" * * * we find in these contracts a reflection of the fundamental policy of the Government to refrain, as much as possible, from doing its own manufacturing and to use, as much as possible (in the production of munitions), the experience in mass production and the genius for organization that had made American industry outstanding in the world. The essence of this policy called for private, rather than public, operation of war production plants. This purpose shines through the following clause in the contract in the Powell case:

" 'Whereas, The Government *desires to have the Contractor, as an independent contractor on a cost-plus-a-fixed-fee basis, make all necessary preparations for the operation of said plant, including the training of operating personnel * * * but excluding the procurement and supervision of the installation of manufacturing facilities [to be done, under a like contract, by the contractor's parent corporation, Western Cartridge Company]; and operate said plant; * * *.'* (Emphasis added.)

"It would have been simple for the Government to have ordered all of this production to have been done under governmental operation as well as under governmental ownership. To do so, however, might have weakened our system of free enterprise. We relied upon that system as the foundation of the general industrial supremacy upon which ultimate victory might depend. In this

light, the Government deliberately sought to insure private operation of its new munitions plants.

"In these great projects built for and owned by the Government, it was almost inevitable that the new equipment and materials would be supplied largely by the Government and that the products would be owned and used by the Government. It was essential that the Government supervise closely the expenditures made and the specifications and standards established by it. These incidents of the program did not, however, prevent the placing of managerial responsibility upon independent contractors.

"The relationship of employee and employer between the worker and the contractor appears not only in the express terminology that has been quoted. It appears in the substantial obligation of the respondent-contractors to train their working forces, make job assignments, fix salaries, meet payrolls, comply with state workmen's compensation laws and Social Security requirements and 'to do all things necessary or convenient in and about the operating and closing down of the Plant, * * *.'"

The affidavit of S. R. Sapirie, Manager of the Oak Ridge Operations Office of the United States Atomic Energy Commission, discloses an investment by the Government in its Oak Ridge Atomic Energy facilities of over a billion and a quarter dollars. The gaseous diffusion plant alone consisted of five main buildings covering several hundred acres. There were at this plant 23 miles of Government-owned railway tracks, 75 auxiliary buildings, a power plant with a generating capacity of 238,000 kilowatts. There were several thousand employees at this facility during the period involved in this litigation. The function of the gaseous diffusion plant was the enrichment of Government-owned uranium in the isotope 235, by a large scale separation of the uranium isotope 235, from a chemical compound of uranium by its diffusion through porous barriers containing billions of very small holes.

The contract, known as Modification 40 of Contract No. W-7405-Eng-26, was entered into on July 16, 1959 between the parent, Union Carbide Corporation, referred to therein as the Corporation, and the United States of America, referred to as the Government, as represented by the United States Atomic Energy Commission. The contract consisted of 50 single-spaced typewritten pages, and as Mr. Sapirie deposed, "constituted a complete statement of all of the terms and conditions of the contract as of that time, with the exception of the approved personnel policies of the corporation as set out in Appendix 'A' to the contract and which deals with such things as fringe benefits, annual and sick leave provisions, jury duty, employees appearing as witnesses in court proceedings, travel pay, payment of moving expenses and like matters not considered pertinent in the instant litigation * * * Although Modification No. 40, a rewrite and consolidation of the contract and previous modifications, was not executed until July 16, 1959, the basic owner-management relationship between the United States and Carbide as outlined in the terms and provisions of Modification No. 40 has been in effect between the Government and Carbide during the entire period pertinent to this litigation."

In brief, the Corporation by Article II was engaged to manage, operate and maintain: the gaseous diffusion plants at Oak Ridge and Paducah, as well as the Y-12 Plant at Oak Ridge for the processing of enriched uranium, separation of lithium isotopes, recovery of uranium, fabrication of weapons components and maintenance of certain facilities in stand-by condition, and the Oak Ridge National Laboratory for research and development in physical and biological sciences, engineering, nuclear reactor development, etc. In addition, it agreed

to procure construction work for the Commission in connection with the Government-owned plant facilities, agreements therefor to contain required labor and wages provisions. It also agreed to provide extensive related and general services.

Recital one to Modification 40 stated that the Corporation had theretofore undertaken the execution of certain functions for the Commission in the production of special nuclear material and the conduct of atomic energy research and development in the Commission's facilities (at Oak Ridge and Paducah).

The second recital provided, in part, as follows:

"  *   *   *   such agreement arose out of the need for the services of an organization with personnel of proved capabilities, both technical and administrative, to manage and operate certain facilities of the Commission and to perform certain work and services for the Commission; and the Commission recognizes the Corporation as an organization having such personnel, and that the initiative, ingenuity and other qualifications of such personnel should be exercised in providing such services under the agreement, to the fullest extent practicable; *   *   * "

The third recital provided for general direction of the contract program by the Commission, and for supervision by it of Government-financed activities of Commission facilities.

The Corporation was allowed a fixed fee of $229,500.00 per month prior to July 1, 1960 and $259,000.00 per month thereafter, or in excess of $3,000,000.00 per year. Article IV allowed to the Corporation " *   *   *   all costs and expenses *   *   *   actually incurred by the Corporation *   *   *   necessary or incident to the performance of the work under this Contract *   *   * " including such items of cost as materials, tools, machinery equipment, utilities, power, fuel, labor costs, subcontract and study costs, transportation, travel, buildings, premiums on bonds and insurance policies, losses and expenses, reconstruction and replacement of work destroyed, Social Security payroll and accounting costs, telephone and telegraph, litigation, etc. Excepted and not included as allowable costs were certain strictly corporate costs such as salaries of its officers, overhead, bad debts, contributions and donations, dividends, entertainment, taxes, losses on other contracts, etc.

The contract provided that the Corporation would not be required to utilize its own funds in making payments for allowable costs, but that the Government would regularly advance funds therefor upon which the Corporation would pay no interest and to which it would acquire no title or interest other than the right to make authorized expenditures therefrom. Funds obligated by the Government with respect to the contract were in excess of one billion, seven hundred million dollars.

The term of the contract ran to June 30, 1964 unless terminated earlier. The Commission could terminate upon default or upon 30-days' notice; the Corporation, upon six-months' notice.

Article IX established an indemnity commitment of a half billion dollars to the Corporation to cover public liability arising out of or in connection with its contractual activity involving a nuclear incident taking place at a contract location and certain other specified locations. Subsection B) 2) of Article IX, although relating to a "nuclear incident", appears to have a bearing upon the responsibility assumed by the Corporation in connection with the operations under the contract. We copy Subsec. B) 2) in full:

"2) The Corporation makes no representation or warranty whatsoever, and assumes no responsibility or obligation, that the plants can be successfully operated (including but not limited to the successful prevention of dangers to person or property which may be involved in such operation of the plants) but the Corporation shall exert its best effort

successfully to operate the plants and otherwise to perform the work provided to be performed by it under this contract."

Article XII provided for payments by the Corporation not to exceed $10,000.00 to an employee in connection with a death, injury or disease resulting from exposure on or after January 18, 1943 to a special hazard in the course of work under the contract. It was specified that such payments were in addition to payments pursuant to workmen's compensation.

There were a number of other provisions commonly found in Government contracts. Article XXIII—Changes in Personnel—is copied in full:

"The Corporation shall furnish sufficient technical, supervisory and administrative personnel to insure the prosecution of the work in accordance with approved programs. If, in the opinion of the Commission, the Corporation falls behind the program schedule, the Corporation shall take such steps as may be necessary to improve its progress, and the Commission may direct it to increase working days per week, or hours of labor per day. When in the opinion of the Commission the Corporation's personnel and/or overhead is excessive for the proper performance of this contract, reductions thereof shall be made as required by the Commission. Failure to promptly comply with such directions shall be deemed sufficient cause to terminate this contract for the fault of the Corporation."

Article XXXVIII provided for payments under the Tennessee and Kentucky unemployment compensation laws. Although workmen's compensation was not expressly provided for, the Corporation was, under Article IV A) 7), permitted as an allowable cost, "Premiums on such bonds and insurance policies as the Commission may approve or require as reasonably necessary for the protection of the Government or the Corporation," and Mr. Sapirie, in paragraphs IV and V of his Affidavit, stated:

"With respect to 'occupational disease' coverage under the Tennessee Workmen's Compensation Act, AEC instructed and directed Carbide to give and Carbide gave the required notice to the State authorities and elected to come under the full coverage provisions of the Tennessee Workmen's Compensation Act and to afford the benefits of such Act to its employees.

"The plaintiff in this litigation has filed a separate suit against Union Carbide Nuclear Company in the Circuit Court for Anderson County, Tennessee, pursuant to the Workmen's Compensation Act alleging that his leukemia is due to and was occasioned by his employment with and for Carbide at the gaseous diffusion plant, that he is bound by the provisions of the Workmen's Compensation Act and claiming statutory benefits. A copy of the Complaint in the Workmen's Compensation suit referred to above is attached hereto as Exhibit 2.

"To service claims under and handle the payment of benefits provided by the Workmen's Compensation Act of the State of Tennessee for employees or their dependents, Carbide at the direction and with the approval of the United States entered into a retrospective rating plan insurance service agreement with Aetna Casualty and Surety Company. Under this arrangement the terms of which were negotiated and established between and by Aetna and the United States, Aetna is reimbursed all costs properly paid on account of Workmen's Compensation claims, including compensation payments, court costs, attorneys fees, medical costs and an added factor to compensate Aetna for its general and administrative expenses. The amounts Aetna is entitled to are paid by and with Government funds furnished to Carbide and in turn paid to Aetna. Under the arrangement Aetna has expressly waived all rights

of subrogation against the United States which might arise by virtue of payments thereunder."

He also stated:

"Under the contract Carbide in managing and operating the Government-owned gaseous diffusion plant works in close day-to-day cooperation with AEC and its staff. The working relationship between the Commission and its management contractor resembles in some respects those between industrial companies and their branch offices; i. e., the Commission establishes the objectives and makes the decisions required to set the operations into the national program, and exercises such controls as are necessary for the prudent use of public funds."

\*      \*      \*      \*      \*      \*

"The financial plan given to Carbide each year contains a detailed outline of the work to be performed broken down in various programs. The financial plan is revised by AEC from time to time if there are significant program or schedule changes, and it is AEC's responsibility to obtain any additional funds needed in connection with the work."

\*      \*      \*      \*      \*

"Underlying the relationship of AEC to Carbide is the mutually recognized principle that AEC is responsible under federal law for the conduct of the national atomic energy program and is required to have full access to all information concerning Carbide's daily performance of the contract work and the authority to exercise such control and supervision of the contract work as AEC may deem to be necessary, incident to which is control over public funds expended by Carbide."

On the basis of Mr. Sapirie's affidavit and the terms of Modification 40, both of which have been closely examined and reviewed in detail herein, and the oral testimony in the record, the Court is of the opinion that Union Carbide Corporation is an independent contractor for the conduct of the Oak Ridge Operations of the Atomic Energy Commission.

It is true that the Corporation owns none of the facilities, or equipment which it uses and is subject to certain controls by the Government. But as we study those controls, we are impressed that they are primarily programming and budgetary in nature, and not the close supervisory controls exercised by a principal over an agent. The Commission had three main objectives in entering this contract, namely, the operation of the gaseous diffusion plants at Oak Ridge and Paducah, the conduct of the specialty projects at Y–12 and the recruitment of the personnel for, and conduct of, the mammoth research work at the Oak Ridge National Laboratory. The attainment of these objectives required know-how, initiative and ingenuity of the highest order, as noted in the second recital. This recital called for the services of personnel of proved capabilities in both technical and administrative fields and it was expected of them to exercise their initiative and ingenuity to the fullest extent practicable. For this, the Corporation was to receive a fee of over three million dollars a year and an incredibly liberal arrangement of allowable costs. In our opinion, the Corporation was hired to do a job and had the utmost freedom in doing so within budgetary and program limitations. We think the case clearly falls within the reasoning of the Courts in Bowaters Southern Paper Corporation v. Brown, supra, and in Powell v. United States Cartridge Co., supra, and of the Tennessee cases cited above, and that Union Carbide Corporation is an independent contractor.

In the case of Carbide & Carbon Chemicals Corp. v. Carson, 192 Tenn. 150, 165, 239 S.W.2d 27, which involved a similar contract, the Supreme Court of Tennessee held that the contractor was an independent contractor rather than an agent.

■ Of course, in an independent action against the United States for its own negligence, both negligence and causation must be proved. Conceivably liability might be based upon the theory, rejected in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, namely, that the United States was at fault in adopting the atomic energy program and in failing to give warning of its dangers and failing properly to police its activities or for simple negligence of another sort, Benson v. United States, (D.C.Cal.) 150 F.Supp. 610, 612. In the Dalehite case, the Court in a four-to-three decision said that the establishment of such a program was based upon the exercise or performance or failure to exercise or perform a discretionary function or duty and could not supply the basis for suit under the Federal Tort Claims Act. See also Hernandez v. United States, 112 F.Supp. 369, 371 (D.C. Hawaii), as to discretion.

The Court is of the opinion that there is a possible basis for suit against the Government for negligence of its independent contractor under the dangerous instrumentality exception noted in Powell v. Virginia Construction Co., supra. This exception was adverted to by Judge Darr in Pierce v. United States, D.C., 142 F. Supp. 721, 728, where the Court said:

"It is true that an employer is not generally liable for the negligence of an independent contractor. However, there is an exception in those cases where, from the nature of the particular work or project, in the natural course of events mischievous consequences can be expected to arise unless means are adopted to prevent it. In such cases the owner-employer is held to be under a non-delegable duty to see that appropriate preventative measures are adopted.

"This enlightened rule has been recognized and given application by the Tennessee courts. Davis v. Cam-Wyman Lumber Co., 126 Tenn. 576, 150 S.W. 545; International Har-

vester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854, certiorari denied by Supreme Court, March 11, 1949."

The Pierce case was affirmed by the Sixth Circuit Court of Appeals in 235 F.2d 466. See also Blue Ridge Rural Electric Corp. v. Byrd, 264 F.2d 689, 693 (C.A. 4); International Harvester Company v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854, 865–866; Stancil v. United States, 196 F.Supp. 478, 481 (D.C.Va.).

In the Pierce case, the Court was considering electricity. We know of no case which has construed nuclear materials or the processing thereof as being dangerous within themselves. Compare Bulloch v. United States, 145 F.Supp. 824, 827 (D.C.Utah). That such materials do have an enormous potential for "mischievous consequences", this Court could readily take judicial notice. It does not need to do so. It needs only to refer to certain provisions of Modification 40 already noted. Article IX established an indemnity commitment by the Government of a half billion dollars to cover public liability for nuclear hazards involved in a single nuclear incident. And in Section B) 2) the Corporation expressly disclaimed responsibility or obligation that the plants could be successfully operated or that dangers to person or property from the operation of such plants could be successfully prevented. These materials, and this operation were ultrahazardous. A nuclear incident of catastrophic magnitude was a considered possibility. And the possibility of safely operating the plants was expressly rejected by the Corporation. There is further evidence of these perils in Article XII which provided for payments not to exceed $10,000 for death, injury or disease resulting from special hazards in the course of work under the contract over and above payments pursuant to workmen's compensation.

■ Of course, under the dangerous instrumentality rule, negligence on the part of the contractor and causation

536

must be proved. And as indicated in Pierce v. United States, supra, contributory negligence is a defense. This burden must be assumed by plaintiff at the hearing on the merits and the Government will have available to it, among others, the defense of contributory negligence.

■■ Brief mention should be made of the defense of the two-year statute of limitations that is discussed in the briefs. Statements of counsel indicate that plaintiff started his suit within a year after he found out that he had leukemia. The record shows that the suit was started within a year after Carbide terminated plaintiff's services.

The courts are divided as to whether the statute of limitations question is controlled by federal law or by state law. The Fifth Circuit in the case of Quinton v. United States, 304 F.2d 234, held that federal law fixes the date upon which Federal Tort Claims period of limitations commences to run and that under federal law, the statute of limitations does not begin to run until claimant discovers the injury or in the exercise of diligence should have discovered it.

The question of when the statute of limitations begins to run or the claim accrues is a matter of federal law. Tessier v. United States, 1 Cir., 269 F.2d 305.

Tennessee applies the rule that if the employer is negligent, the tort may be continuous, in which event the statute of limitations does not begin to run until the termination of plaintiff's work. Tennessee Eastman v. Newman, (1938) 22 Tenn.App. 270, 121 S.W.2d 130.

The Court cannot pass upon the statute of limitations question with finality until it hears the proof on the merits.

For the reasons indicated, defendant's motion for a summary judgment and in the alternative for dismissal must be overruled. A separate order overruling the motion will be passed to the Clerk.