William H. GROGAN, James B. Shepeard, Raymond Carner, Ottis Lutz, Plaintiffs,

United States Fidelity & Guaranty Company, Intervenor,

v.

UNITED STATES of America, Defendant and Third-Party Plaintiff,

v.

TECON CORPORATION, Third-Party Defendant.

Civ. A. No. 1190.

United States District Court
W. D. Kentucky,
at Paducah.

Oct. 31, 1963.

Charles A. Williams, Paducah, Ky., for plaintiffs.

William E. Scent, U. S. Atty., Louisville, Ky., for defendant.

David R. Reed, Paducah, Ky., for intervenor and third-party defendant.

SHELBOURNE, District Judge.

This action was brought by the plaintiffs, William H. Grogan, James B. Shepeard, Raymond Carner, and Ottis Lutz, against the United States of America under the provisions of the Federal Tort Claims Act, Section 1346(b) of Title 28 United States Code.

Plaintiffs seek to recover damages for injuries sustained on April 13, 1960, in the course of their employment with Tecon Corporation while engaged in the construction of the locks of the Barkley Dam Project on the Cumberland River in Livingston County, Kentucky, under the terms of Tecon's contract with the United States Army Corps of Engineers. Plaintiffs were injured when the wooden scaffolding and stairway, fastened to the lock wall by bolts embedded in the concrete, upon which they were standing fell approximately forty feet to the concrete surface below.

Prior to April 13, 1960, each of the plaintiffs and their employer, Tecon, had accepted and were working under the provisions of the Kentucky Workmen's Compensation Act, Chapter 342 of the Kentucky Revised Statutes. United States Fidelity & Guaranty Company, intervening plaintiff in this action, was Tecon's compensation carrier.

It is alleged by plaintiffs that their injuries resulted from the negligence and carelessness of the Government's agents in designing the scaffolding and stairway and in failing to make proper inspection of same to insure protection of the life and health of persons working on the project. In its third-party complaint, the Government avers that under the terms of its contract Tecon, third-party defendant, is bound for its negligence and must indemnify the Government and save it harmless from any judgment plaintiffs may obtain against it. In effect, the Government contends that, if it was negligent, its negligence was passive and secondary while that of Tecon, if any, was active and primary.

The case was tried before the Court without a jury on April 24, 1963, and submitted on briefs.

From the testimony heard, exhibits filed, and briefs of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

(1) On December 5, 1958, the United States of America entered into a contract with Tecon Corporation, a Texas corporation, for the construction of Barkley Lock, incident to the Barkley Dam Project on the Cumberland River, in Livingston County, Kentucky.

(2) The United States was in possession of the realty upon which Barkley Lock was constructed.

(3) The portions of Tecon's contract. material to this case are:

"*Statement of Work.* The Contractor shall furnish all labor, equipment, and materials and perform the work above described for the amount stated above in strict accordance with the General Provisions (Standard Form 23a), specifications, schedules, drawings, and conditions all of which are made a part hereof and designated as follows:

\*   \*   \*   \*   \*   \*

"GENERAL PROVISIONS

\*   \*   \*   \*   \*   \*

"8. MATERIALS AND WORKMANSHIP

" \*   \*   \* The Contracting Officer may in writing require the Contractor to remove from the work such employee as the Contracting Officer deems incompetent, careless, insubordinate, or otherwise objectionable, or whose continued work on the project is deemed by the Contracting Officer to be contrary to the public interest.

"9. INSPECTION

"(a) Except as otherwise provided in paragraph (d) hereof all material and workmanship, if not otherwise designated by the specifications, shall be subject to inspection, examination, and test by the Contracting Officer at any and all times during manufacture and/or construction

and at any and all places where such manufacture and/or construction are carried on. The Government shall have the right to reject defective material and workmanship or require its correction. * * *

## "10. SUPERINTENDENCE BY CONTRACTOR

"The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for him.

## "11. PERMITS AND RESPONSIBILITY FOR WORK, ETC.

"The Contractor shall, without additional expense to the Government, obtain all licenses and permits required for the prosecution of the work. He shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work. He shall also be responsible for all materials delivered and work performed until completion and final acceptance, except for any completed unit thereof which theretofore may have been finally accepted.

\* \* \* \* \* \*

## "30. ACCIDENT PREVENTION

"(a) In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies, and equipment; and for avoidance of work interruptions in the performance of this contract; the Contractor will comply with all pertinent provisions of EM 385–1–1, dated 13 March 1958, entitled 'General Safety Requirements', as amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.

## "PART II—GENERAL CONDITIONS

\* \* \* \* \* \*

"GC–18. *ACCIDENT PREVENTION:* In addition to full compliance with the requirements of the article of the contract entitled 'Accident Prevention', the Contractor will comply with the following provisions:

"a. Prior to commencement of work the Contractor will:

"(1) Submit in writing to the Contracting Officer, his proposals for effectuating the provisions of the article of the contract entitled 'Accident Prevention'.

"(2) Meet in conference with representative of the Contracting Officer to discuss and develop mutual understandings relative to administration of the overall safety program.

"b. During the performance of work under the contract, the Contractor shall comply with all procedures prescribed by the Contracting Officer for the control and safety of persons visiting the job site and will comply with such requirements to prevent accidents as may be specified under the Special Conditions of these specifications or issued by the Contracting Officer.

"GC–19. *INSPECTION:* The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract. As soon as practicable after the completion of the entire work, or any divisable part thereof as may be designated in these specifications, a thorough examination thereof will be

made by the Contracting Officer at the site of the work. If such work is found to comply fully with the requirements of the contract, it will be accepted; and final payment therefor will be made in accordance with the article of the contract entitled 'Payments to Contractors'.

### "PART III—SPECIAL CONDITIONS

\* \* \* \* \* \*

### "SC-6. DRAWINGS TO BE FURNISHED BY CONTRACTOR

\* \* \* \* \* \*

"(d) *Types of Forms.*—Prior to construction in the shop, the contractor shall submit shop drawings of all types of proposed forms to the Resident Engineer for information and review. Drawings shall indicate size and spacing of strongbacks, walers, studs, tie-rods, anchors, size and type of sheathing, catwalks, ladders and miscellaneous bracing. Three copies of drawings for each type form shall be furnished."

(4) The pertinent provisions of Army Corps of Engineers Manual EM 585–1–1, dated March 13, 1958, referred to in the contract, General Provisions § 30 quoted herein, are:

### "SECTION XX

### "RAMPS, RUNWAYS, PLATFORMS, AND SCAFFOLDS

### "GENERAL

"20–1. Scaffolds, platforms, or temporary floors shall be provided for all work except that which can be done safely from the ground, other substantial footing or from ladders. (The use of ladders for other than a means of access should be eliminated as far as possible.) \* \* All false work, trestles, ramps, scaffolds, and similar temporary load-bearing structures shall be designed, constructed, and maintained with a safety factor of not less than four.

\* \* \* \* \* \*

"20–6. All scaffolds or working platforms of any nature shall be securely fastened to the building or structure, or if independent of the building shall be braced or guyed to prevent sway.

### "CONSTRUCTION

"20–9. The standards as listed herein are the minimum standards which will be used in the design and construction of runways, ramps, platforms, and scaffolds but will not be interpreted to relieve compliance with applicable State, municipal, or local laws, ordinances, or regulations which establish higher standards.

\* \* \* \* \* \*

### "STAIRWAYS

"20–25. On all structures two or more floors (20 ft. or over) in height stairways shall be provided for workmen during the construction period. Where permanent stairways are not constructed or installed concurrently with the construction of each floor a temporary stairway shall be provided.

"20–26. Temporary stairways and handrails shall be constructed of selected materials, free of imperfections, and shall be rigidly secured to the structure. Wooden treads shall be securely nailed in place. Risers will be of a uniform height and treads of uniform width. No flight of temporary stairs shall have an unbroken vertical rise of more than 12 feet."

(5) The scaffolding involved in this action was constructed of wood and consisted of a stairway of two flights with a platform approximately five feet by six feet at the top of each flight and affixed to the uppermost flight was a ladder leading to a cat-walk. The cat-walk was plaintiffs' working area for aligning metal concrete forms used in constructing the lock wall.

(6) At the beginning of their shift on April 13, 1960, the plaintiffs, each car-

rying a tool box weighing approximately sixty pounds, were ascending the scaffolding to reach their work area on the cat-walk. They had reached the second platform and were starting up the ladder when the scaffolding pulled away from the lock wall and fell, causing the plaintiffs to fall to the ground and sustain injuries.

(7) Each of the platforms of the stairway rested on two wooden triangular jacks positioned at opposite ends of the platform. The top side of the jacks extended perpendicularly from the face of the lock wall and parallel to the ground. Each of the jacks was affixed to and supported by a three-quarter inch steel bolt approximately thirty inches in length. Each end of the bolt was threaded and one end was fastened to the jack by a steel nut; the other end was screwed into a metal coupling that was also threaded on each end. The opposite end of the metal coupling was inserted into an opening in the lock wall one and three-eighths inches in diameter and screwed to a threaded anchor road permanently embedded in the concrete.

(8) The proximate cause of the fall of the scaffolding, resulting in injury to the plaintiffs, was the breaking of the steel bolt fastened to one of the jacks supporting the upper platform at a point about one-half inch outside the face of the lock wall; the coupling holding the remaining bolt, which was attached to the anchor rod embedded in the lock wall by four threads or less, was pulled off the anchor rod by the additional pressure placed on it by reason of the broken bolt.

(9) The scaffolding involved here was not inherently dangerous. The design, construction, erection and use of the stairway, platforms, and ladder were in accordance with accepted safe construction standards and practices.

(10) All of the materials used in the construction of the scaffolding, including triangular jacks, steel bolts, nuts, and couplings, were the property of Tecon and were installed by Tecon's employees.

(11) There was no showing in the evidence that the Government, by actions of its agents, assumed duties not imposed by the contract with respect to the safety of plaintiffs and others of their class.

## CONCLUSIONS OF LAW

(1) The Court has jurisdiction of the parties and of the subject matter of this action. 28 U.S.C. §§ 1345, 1346, 2674.

(2) This action arises under the Federal Tort Claims Act and the issue is whether the Government owed a duty to the plaintiffs to discover the unsafe condition of the scaffolding. The issue is determinable under Kentucky law. Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

When an employee of an independent contractor is injured, the owner is liable only when the work done by the independent contractor is a nuisance or inherently dangerous. "But where the work is not a nuisance and is not inherently dangerous and the injuries or damages are caused by the negligent manner in which the independent contractor performs his task, then the owner is not liable." Jennings v. Vincent's Adm'x, 284 Ky. 614, 622, 145 S.W.2d 537, 541 (1940).

Scaffolding is not inherently dangerous as a matter of law in Kentucky. In Nashville Bridge Co. v. Marsh, 212 Ky. 728, 279 S.W. 1099 (1926), the Court of Appeals absolved from liability an owner whose scaffolding collapsed while the employee of an independent contractor was removing it.

(3) In Wallach v. United States, D.C. N.Y., 184 F.Supp. 785, affirmed 2 Cir., 291 F.2d 69 (1961), cert. denied 368 U.S. 935, 82 S.Ct. 373, 7 L.Ed.2d 197 (1961), a painter employed by a painting contractor was injured when the contractor's scaffolding in a Post Office collapsed. The painter sued the United States under the Federal Tort Claims Act. 184 F.Supp. At page 790 of its opinion, the trial court said:

" * * * it is clear that the precise issue posed is whether or not the defendant, either in its role as owner or general contractor, assumed the responsibility of supervising the erection and use of the scaffolding from which the plaintiff fell under the terms of the contract entered into with Lieberman.

"Reading the provisions of the contract, which was received in evidence, it appears that the defendant retained for itself general authority to approve the equipment to be used for the performance of the interior painting of the Post Office, for the purpose of insuring that the independent contractor complied with its contract to do the work in a satisfactory manner, rather than to regulate the details of the work. In this respect, every actual term of the contract referable to the erection and use of the scaffolding equipment indicates that it was the understanding of the contracting parties that the painting contractor was to be responsible for the proper installation and use of such equipment.

"The Court concludes that this limited contractual power of general supervision retained by the general contractor (and/or owner) for the purpose of seeing that the work was being properly done by the subcontractor, according to the plans and specifications, does not make it liable for the independent negligent act of the subcontractor."

In the case at bar the Government retained a general supervisory power which by the contract required the independent contractor to follow the Corps of Engineers' Safety Manual, to provide a competent superintendent to be on the job at all times, and to comply with the safety procedures specially laid down by the Corps of Engineers for the particular job. The Government had the right, but not the duty, to inspect the work, to add safety requirements, and to call any defects to the contractor's attention.

(4) In Kirk v. United States, 9 Cir., 270 F.2d 110 (1959), Kirk, an employee of an independent contractor, was removing scaffolding at Lucky Peak Dam on the Boise River in Idaho when the structure collapsed and threw him into the river where he drowned. In the action brought by his personal representative against the United States under the Federal Tort Claims Act, an attempt was made to show that the Government had. actual control of the safety measures on. the job under its contract with the decedent's employer. The contract was remarkably similar to the contract in this. case. It was held that the Government had no legal duty to take safety measures for the benefit of employees like Kirk because of the absence of any statute requiring it and, 270 F.2d at page 117, the court said:

"The general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity, is not subject to a construction establishing a civil liability."

The statute involved in that case was Section 701b of Title 33 United States Code, which provides that the Corps of Engineers has jurisdiction of improvements of rivers and waterways for flood control and other purposes.

(5) Schmid v. United States, 7 Cir., 273 F.2d 172 (1959), involved the fall from a scaffold of a carpenter employed by an independent contractor doing repair work on a Government building at Scott Air Force Base in Illinois. A judgment for the carpenter under the Federal Tort Claims Act was affirmed because, under an Illinois statute, the United States Air Force had a non-delegable duty to assure that the scaffolding complied in all respects with the State statute. The only Kentucky statute applicable to scaffolding is KRS 338.160–338.190, inclusive, and it applies only to cities of the first and second classes.

(6) The Government insists that under the teaching of Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.

Ed. 1427 (1953), it has consented to be sued under the Federal Tort Claims Act only where a private person would be liable under the respondeat superior doctrine under the law of the State.

(7) In United States v. Taylor, 6 Cir., 236 F.2d 649 (1956), our Circuit Court of Appeals said that, by the explicit terms of the Federal Tort Claims Act, the waiver of sovereign immunity is limited to instances where the damages sustained were caused by the negligent or wrongful act or omission of an employee of the Government acting within the scope of his employment and under circumstances where the Government, if a private person, would be liable to the claimant under the law of the State where the accident occurred.

(8) The Court has considered the case of Mahoney v. United States, D.C.Tenn., 216 F.Supp. 523 (1963), and the very thorough and extensive opinion of Judge Taylor which was decided upon the dangerous instrumentality doctrine.

In Stratton v. United States, D.C. Tenn., 213 F.Supp. 556 (1962), Judge Neese held that under the Dalehite ruling the Government cannot be held liable under the dangerous instrumentality nondelegable duty rule and that the Federal Tort Claims Act requires a negligent act or omission by a Government employee; liability does not arise by virtue of either Government ownership of an inherently dangerous commodity or engaging in an extra-hazardous activity.

## CONCLUSION

It was not alleged in the complaint nor was it contended at the trial of this case that the stairway and scaffolding constituted a dangerous instrumentality. It would not have afforded plaintiffs any claim upon which this Court could have granted relief had it been so alleged or contended. The doctrine of the Stratton case, supra, is decisive of this case.

It is ordered that the complaint in this action be and same is dismissed and the United States is awarded its costs in this action.